STATE OF CONNECTICUT *v.* PATRICK S. EADY
(SC 15858)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.

Argued March 26, 1998—officially released July 6, 1999

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *John H. Malone*, assistant state's attorney, for the appellant (state).

*Richard Condon, Jr.*, deputy assistant public defender, for the appellee (defendant).

*Opinion*

CALLAHAN, C. J. The defendant, Patrick S. Eady, was charged in an information with illegal possession of narcotics in violation of General Statutes § 21a-279 (a),[1] illegal possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (b),[2] illegal

[1] General Statutes § 21a-279 (a) provides: "Any person who possesses or has under his control any quantity of any narcotic substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than seven years or be fined not more than fifty thousand dollars, or be both fined and imprisoned; and for a second offense, may be imprisoned not more than fifteen years or be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for any subsequent offense, may be imprisoned not more than twenty-five years or be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

[2] General Statutes § 21a-277 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with intent to sell or dispense, possesses with intent to sell or dispense, offers, gives or administers to another person any controlled substance, except a narcotic substance, or a hallucinogenic substance other than marijuana, except as authorized in this chapter, may, for the first offense, be fined not more than twenty-five thousand dollars or be imprisoned not more than seven years or be both fined and imprisoned; and, for each subsequent offense, may be fined not more than one hundred thousand dollars or be imprisoned not more than fifteen years, or be both fined and imprisoned."

possession of marijuana in violation of General Statutes § 21a-279 (c)[3] and illegal possession of marijuana with intent to sell in violation of General Statutes § 21a-277 (a).[4] Prior to trial, the defendant moved, pursuant to Practice Book § 820 et seq., now § 41-12 et seq., and General Statutes § 54-33f, to suppress illicit drugs seized during a search of his residence. The defendant maintained that the warrantless search and the subsequent seizure of the drugs violated his rights under the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution. After a hearing, the trial court granted the defendant's motion to suppress. Subsequently, pursuant to General Statutes § 54-56,[5] the defendant moved to dismiss the charges

[3] General Statutes § 21a-279 (c) provides: "Any person who possesses or has under his control any quantity of any controlled substance other than a narcotic substance, or a hallucinogenic substance other than marijuana or who possesses or has under his control less than four ounces of a cannabis-type substance, except as authorized in this chapter, for a first offense, may be fined not more than one thousand dollars or be imprisoned not more than one year, or be both fined and imprisoned; and for a subsequent offense, may be fined not more than three thousand dollars or be imprisoned not more than five years, or be both fined and imprisoned."

[4] General Statutes § 21a-277 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

[5] General Statutes § 54-56 provides: "All courts having jurisdiction of criminal cases shall at all times have jurisdiction and control over informations and criminal cases pending therein and may, at any time, upon motion by the defendant, dismiss any information and order such defendant discharged if, in the opinion of the court, there is not sufficient evidence or cause to justify the bringing or continuing of such information or the placing of the person accused therein on trial."

against him for lack of sufficient evidence. The court granted the defendant's motion to dismiss. The state, on the granting of permission by the trial court, appealed from the trial court's judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c). The appeal originally was argued before a five judge court. See *State* v. *Eady*, 245 Conn. 464, 733 A.2d 95 (1998). Thereafter, we granted the state's motion for en banc reconsideration pursuant to Practice Book § 71-5. See, e.g., *State* v. *Brown*, 235 Conn. 502, 506, 668 A.2d 1288 (1995); *State* v. *Chapman*, 229 Conn. 529, 532, 643 A.2d 1213 (1994); *State* v. *Medina*, 228 Conn. 281, 284 n.4, 636 A.2d 351 (1994). We now reverse the judgment of the trial court.

The following facts are undisputed. At approximately 3 p.m. on August 12, 1995, the Windsor volunteer fire department responded to a reported fire in a single-family residence at 19 Songonosk Street in Windsor. Once the fire had been suppressed sufficiently to permit safe entry, Fire Captain Angel L. Marrero and other firefighters entered the residence to ventilate it and to search for possible victims. During the course of that procedure, Marrero came upon a closed door. The door, which was locked, led to the defendant's bedroom. Marrero forced the door open in order to search for possible victims of the fire. Finding none, he opened a window to ventilate the room. While opening the window, Marrero observed two cigar boxes in plain view on a dresser in the bedroom. One box was open and contained, among other things, a small, clear plastic bag with a small quantity of a green, leafy substance. At the time Marrero noticed the substance in the cigar box, he was lawfully present in the bedroom and was acting within the scope of his authority.

Marrero informed William Lewis, the fire chief in charge at the scene, that he believed that he had found

marijuana in the house. Thereafter, Lewis conveyed that information to Sergeant Thomas Lepore of the Windsor police department, who was outside the residence directing traffic. Lepore entered the defendant's bedroom and observed in the cigar box a substance that he recognized as marijuana. Cocaine in rock and powder form was also found in the cigar box along with a shopping card with the defendant's name on it and a photograph of the defendant. Lepore seized the cigar box and its contents without obtaining a warrant.

The sole issue in this appeal is whether Lepore's seizure of the drugs from the defendant's bedroom was the product of an illegal, warrantless search, in violation of the defendant's right under the fourth amendment to the United States constitution to be free from unreasonable search and seizure.[6] The state claims that Lepore's entry into the defendant's bedroom and subsequent seizure of the drugs were valid under the "plain view" exception to the fourth amendment warrant requirement. We agree.

---

[6] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Although the defendant refers to a violation of his rights under article first, § 7, of the Connecticut constitution, he has failed to provide an independent analysis of the state constitutional issues. See *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992) (setting forth appropriate factors to be addressed when raising state constitutional claim). "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . . *State* v. *Robinson*, 227 Conn. 711, 721–22, 631 A.2d 288 (1993); see also *State* v. *Williams*, 231 Conn. 235, 245 n.13, 645 A.2d 999 (1994); *State* v. *Joyner*, 225 Conn. 450, 458 n.4, 625 A.2d 791 (1993); *State* v. *Rosado*, 218 Conn. 239, 251 n.12, 588 A.2d 1066 (1991)." (Internal quotation marks omitted.) *State* v. *Ellis*, 232 Conn. 691, 692 n.1, 657 A.2d 1099 (1995).

As a threshold matter, we set forth the appropriate standard under which we review a challenge to a trial court's granting of a suppression motion. " 'This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court. Beyond that, we will not go.' *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980)." *State* v. *Zindros*, 189 Conn. 228, 238, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984).

The fourth amendment to the United States constitution, made applicable to the states through the fourteenth amendment, prohibits unreasonable searches and seizures by government agents. Subject to a few well defined exceptions, a warrantless search and seizure is per se unreasonable. *Katz* v. *United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); *State* v. *Miller*, 227 Conn. 363, 383, 630 A.2d 1315 (1993); *State* v. *Lewis*, 220 Conn. 602, 609, 600 A.2d 1330 (1991). The state bears the burden of proving that an exception to the warrant requirement applied. *Mincey* v. *Arizona*, 437 U.S. 385, 390–91, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *State* v. *Blades*, 225 Conn. 609, 618, 626 A.2d 273 (1993).

In *Coolidge* v. *New Hampshire*, 403 U.S. 443, 464–73, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), the United States Supreme Court articulated what has become known as the plain view exception to the warrant requirement.

The warrantless seizure of contraband that is in plain view is reasonable under the fourth amendment if two requirements are met: "(1) the initial intrusion that enabled the police to view the items seized must have been lawful; and (2) the police must have had probable cause to believe that these items were contraband or stolen goods."[7] *State* v. *Ruscoe*, 212 Conn. 223, 237–38 n.8, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990); *State* v. *Reddick*, 207 Conn. 323, 335, 541 A.2d 1209 (1988).

In *Michigan* v. *Tyler*, 436 U.S. 499, 509–10, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978), the United States Supreme Court concluded that the fourth amendment protection against unreasonable search and seizure applies to fire officials as well as other governmental agents. The court concluded, however, that "[a] burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.' Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze. . . . [Furthermore, fire] officials need no warrant to remain in the building for a reasonable time to investigate the cause of a blaze after it has been extinguished. And if the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional."

[7] Under *Coolidge*, it was unclear when and whether a third requirement, that the police must have discovered the evidence or contraband inadvertently, applied. We have concluded that " 'inadvertence is not required if the items seized fall under the category of contraband, stolen property or objects dangerous in themselves.' " *State* v. *Couture*, 194 Conn. 530, 547, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); see *Horton* v. *California*, 496 U.S. 128, 137–38, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). Because marijuana, the possession of which is illegal pursuant to § 21a-279 (c), is contraband, we need not address the issue of inadvertence. See, e.g., *State* v. *Sailor*, 33 Conn. App. 409, 414, 635 A.2d 1237 (1994).

(Citations omitted.) Id. In *Michigan* v. *Clifford*, 464 U.S. 287, 293–94, 104 S. Ct. 641, 78 L. Ed. 2d 477 (1984), the court expressly concluded that evidence of criminal activity observed in plain view by firefighters may be seized without a warrant, if it is observed after a lawful entry. Although both *Tyler* and *Clifford* involved the seizure of evidence relating to arson, numerous state and lower federal courts, including our Appellate Court, have concluded that evidence of crimes other than arson, when observed in plain view by fire officials who are lawfully present on the premises, also may be seized without a warrant. *United States* v. *Johnson*, 524 F. Sup. 199, 204–205 (D. Del. 1981) (drugs and drug paraphernalia), rev'd on other grounds, 690 F.2d 60 (3d Cir. 1982), cert. denied, 459 U.S. 1214, 103 S. Ct. 1212, 75 L. Ed. 2d 450 (1983); *State* v. *Wilson-Bey*, 21 Conn. App. 162, 166–67, 572 A.2d 372, cert. denied, 215 Conn. 806, 576 A.2d 537 (1990) (same);[8] *Commonwealth* v. *Person*, 385 Pa. Super. 197, 204, 212–13, 560 A.2d 761 (1989) (Beck, J., concurring and dissenting) (same); *State* v. *Bell*, 108 Wash. 2d 193, 196 n.1, 737 P.2d 254 (1987) (same); annot., Admissibility, in Criminal Case, of Evidence Discovered by Warrantless Search in Connection with Fire Investigation—Post-*Tyler* Cases, 31 A.L.R.4th 194 (1984).

It is undisputed that at the time Marrero observed the open cigar box and its contents, he was lawfully present in the defendant's bedroom and was acting within the scope of his authority as a firefighter. The

---

[8] In *Wilson-Bey*, the Appellate Court concluded that there was no fourth amendment violation where arson investigators who were lawfully on the premises observed and seized evidence of drug activity without a warrant. *State* v. *Wilson-Bey*, supra, 21 Conn. App. 165. The evidence seized included drug manufacturing equipment, crack cocaine vials, a propane torch and a packet of white powder found in the refrigerator. Id. The court concluded that the seizure of those items by fire investigators did not violate the fourth amendment because the requirements of the plain view exception were met. Id., 166–67.

open cigar box and its contents were, furthermore, in plain view. Consequently, the first element of the plain view exception to the warrant requirement, namely, that the initial entry be lawful, was satisfied.

The only questions that remain, therefore, are: (1) whether it was immediately apparent to Marrero that the cigar box contained contraband;[9] and (2) whether Lepore's subsequent entry and seizure were a lawful extension of Marrero's presence and observation.

I

The "immediately apparent" requirement of the plain view exception is satisfied if, at the time of discovery of the contraband or evidence, there is "probable cause to associate the property in plain view with criminal activity without further investigation." *State* v. *Reddick*, supra, 207 Conn. 335, citing *Arizona* v. *Hicks*, 480 U.S. 321, 324–27, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987). We consistently have held that "[t]he quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required

---

[9] In determining whether the seizure of contraband was supported by probable cause, several courts from other jurisdictions have also considered the knowledge of the police officer who actually seized the evidence. See, e.g., *United States* v. *Green*, 474 F.2d 1385, 1390 (5th Cir.), cert. denied, 414 U.S. 829, 94 S. Ct. 55, 38 L. Ed. 2d 63 (1973); *People* v. *Harper*, 902 P.2d 842, 846 (Colo. 1995); *State* v. *Loh*, 275 Mont. 460, 474, 914 P.2d 592 (1996); *Commonwealth* v. *Person*, supra, 385 Pa. Super. 197. These courts have concluded that, because police officers who are present in the emergency situation may step into the shoes of the firefighters who are conducting the "search," it is permissible to include the knowledge of the firefighter and the police officer in determining if there is probable cause to believe that the substance observed by both was contraband, thus making the seizure lawful. Id. Consequently, there need not be proof of an independent determination of probable cause by the fire official prior to the police officer's entry. Because we conclude that a reasonably prudent firefighter who observed the contraband under the same circumstances as Marrero would be reasonably confident that the green, leafy substance in the open cigar box was marijuana, we do not consider the question of whether the nature of the contraband was immediately apparent to Lepore as well.

for conviction." (Internal quotation marks omitted.) *State* v. *Marra*, 222 Conn. 506, 513, 610 A.2d 1113 (1992). "While probable cause requires more than mere suspicion . . . the line between mere suspicion and probable cause necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances. . . . The existence of probable cause does not turn on whether the defendant could have been convicted on the same available evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Trine*, 236 Conn. 216, 237, 673 A.2d 1098 (1996). "Our cases have made clear [t]hat there is often a fine line between mere suspicion and probable cause . . . ." (Internal quotation marks omitted.) *State* v. *Marra*, supra, 513; *In re Keijam T.*, 221 Conn. 109, 115, 602 A.2d 967 (1992). Furthermore, we have concluded that "proof of probable cause requires less than proof by a preponderance of the evidence. *In re Keijam T.*, [supra, 115]; see also *State* v. *Davis*, 229 Conn. 285, 295, 641 A.2d 370 (1994)." *State* v. *Munoz*, 233 Conn. 106, 135–36, 659 A.2d 683 (1995).

"Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . The probable cause determination is, simply, an analysis of probabilities. . . . The determination is not a technical one, but is informed by the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act. . . . Probable cause is not readily, or even usefully, reduced to a neat set of legal rules. . . . Reasonable minds may disagree as to whether a particular [set of facts] establishes probable cause." (Citations omitted; internal quotation marks omitted.) *State* v. *Diaz*, 226 Conn. 514, 541, 628 A.2d 567 (1993). It is axiomatic that "[t]he probable cause test then is an objective one." (Internal

quotation marks omitted.) *State* v. *Trine*, supra, 236 Conn. 237. The United States Supreme Court has endorsed an objective standard, noting that "even-handed law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." *Horton* v. *California*, 496 U.S. 128, 138, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990); see *Whren* v. *United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) ("[s]ubjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis"); *Ornelas* v. *United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996) (probable cause based upon evaluation of "facts, viewed from the standpoint of an objectively reasonable police officer"); *Maryland* v. *Macon*, 472 U.S. 463, 470–71, 105 S. Ct. 2778, 86 L. Ed. 2d 370 (1985) ("[w]hether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time'. . . and not on the officer's actual state of mind at the time the challenged action was taken" [citation omitted]).

In light of this objective standard we need only look to the evidence presented relating to Marrero's knowledge and to determine whether, on the basis of that knowledge, a reasonable person would have had probable cause to believe that the green, leafy substance contained in the clear plastic bag in the cigar box in the defendant's locked bedroom was marijuana. Consequently, we must determine whether a firefighter of ordinary prudence could believe that a green, leafy substance in a plastic bag in a cigar box in a locked bedroom in a single-family residence was probably marijuana. One needs no expertise in drug identification to conclude that such a green, leafy substance is marijuana. Cf. *State* v. *Delossantos*, 211 Conn. 258, 281, 559 A.2d

164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989) ("[i]t is by now common knowledge that cocaine is often packaged as a white powder in small plastic bags" [internal quotation marks omitted]). In fact, most people who observe a green, leafy substance under the same conditions as those Marrero encountered would believe that it is marijuana. What other green, leafy substance would one keep in a plastic bag in a cigar box in a locked bedroom? To be sure, it is possible that the bag could have contained some other substance such as oregano, and, it is even possible that an individual might, for some extraordinary reason, keep kitchen spices in his bedroom. We are not concerned here with mere possibilities, however, but with probabilities. Moreover, had the packet been found on the spice rack in the defendant's kitchen, the probability that the green, leafy substance was marijuana would have been substantially decreased. The fact remains, however, that the bag was found in plain view in the defendant's bedroom. We conclude, therefore, that a reasonable and prudent person in Marrero's situation could have believed that the green, leafy substance inside the clear plastic bag located in plain view in the open cigar box in the defendant's locked bedroom was probably marijuana. See *State* v. *Bell*, supra, 108 Wash. 2d 197–98 (firefighters capable of recognizing substance as marijuana to meet "immediately apparent" requirement). Consequently, Marrero's observation of the marijuana satisfies the "immediately apparent" requirement of the plain view exception to the warrant requirement.[10]

---

[10] The defendant asserts that because Marrero testified at the suppression hearing that "[he] had a question in [his] mind if it happened to be marijuana," his actions were not supported by probable cause. Because the test for probable cause is objective, however, Marrero's subjective state of mind does not control. See, e.g., *Whren* v. *United States*, supra, 517 U.S. 813; *Ornelas* v. *United States*, supra, 517 U.S. 696; *Horton* v. *California*, supra, 496 U.S. 138; *Maryland* v. *Macon*, supra, 472 U.S. 470–71; see also *Craig* v. *Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (subjective beliefs of police officers irrelevant to probable cause analysis); *United States* v. *Roy*, 869

## II

Having determined that Marrero's observation of the marijuana satisfied both elements of the plain view exception, we next address the question of whether the subsequent entry and seizure of the contraband by Lepore without a warrant were constitutionally permissible as an extension of Marrero's lawful entry and observation of the contraband. We concluded in *State* v. *Magnano*, 204 Conn. 259, 267, 528 A.2d 760 (1987), that "when a law enforcement officer enters private premises in response to a call for help, and during the course of responding to the emergency observes but does not take into custody evidence in plain view, a subsequent entry shortly thereafter, by detectives whose duty it is to process evidence, constitutes a mere continuation of the original entry." Our reasoning in *Magnano* was based in large part on the fact that such a rule enhances sound policy with respect to police investigation techniques. Id., 271. We noted that "[i]t is

F.2d 1427, 1433 (11th Cir. 1989) (rejecting notion that probable cause turns on subjective beliefs of law enforcement officers and holding that "[c]ourts determine the existence of probable cause"); *United States* v. *Clark*, 559 F.2d 420, 425 (5th Cir.), cert. denied, 434 U.S. 969, 98 S. Ct. 516, 54 L. Ed. 2d 457 (1977) ("even though a police officer believed that probable cause was lacking, the Court still had a duty to objectively determine if probable cause was present"); *United States* v. *Resnick*, 455 F.2d 1127 (5th Cir.), cert. denied sub nom. *Carlton* v. *United States*, 409 U.S. 875, 93 S. Ct. 121, 34 L. Ed. 2d 127 (1972), cert. denied, 414 U.S. 1008, 94 S. Ct. 370, 38 L. Ed. 2d 246 (1973) (same). Therefore, at best, the "question" in Marrero's mind is relevant only to the extent that his subjective state of mind reflects that of a reasonable person. Moreover, when further asked at the suppression hearing what he thought he had seen, Marrero responded unequivocally, "[m]arijuana." Taken together, these statements clearly demonstrate that Marrero had a firm, but not absolute, belief that the substance in the cigar box was marijuana. All that is required for probable cause is a reasonable belief, not absolute certainty. See, e.g., *State* v. *Trine*, supra, 236 Conn. 237; *State* v. *Marra*, supra, 222 Conn. 513; *In re Keijam T.*, supra, 221 Conn. 115. Therefore, Marrero's testimony at the suppression hearing buttresses, rather than undercuts, the conclusion that his actions were supported by probable cause.

a reasonable and logical procedure for experienced law enforcement personnel to process evidence at crime scenes. The purpose is to promote careful preservation of evidence and to permit a complication-free chain of custody. The promotion of more accurate evidence gathering serves the legitimate interests of all parties. Our conclusion in this case serves to further this reasonable practice." Id. In addition, we concluded in *Magnano* that such a rule comports with the purpose of the plain view doctrine. Id. We noted that " '[w]here, once an otherwise lawful search is in progress, the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous—to the evidence or to the police themselves—to require them to ignore it until they have obtained a warrant particularly describing it.' . . . [T]he defendant cannot be heard to complain that the second entry into the premises by the detectives affected her privacy interests. As the United States Supreme Court stated in *Illinois* v. *Andreas*, 463 U.S. 765, 772, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983), '[t]he plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy.' " *State* v. *Magnano*, supra, 271.

Our decision in *Magnano* involved the issue of an initial entry by a patrol officer and a subsequent entry by a detective. As yet, we have not had the opportunity to address the specific situation presented here, where the initial entry is by a firefighter and the subsequent entry is by a police officer. For purposes of plain view doctrine analysis, however, there is no meaningful distinction between the two scenarios. As in *Magnano*, the initial lawful entry by a government agent, who was entitled to seize contraband observed in plain view;

*State* v. *Wilson-Bey*, supra, 21 Conn. App. 166–67; *Commonwealth* v. *Person*, supra, 385 Pa. Super. 213; eliminated the defendant's reasonable expectation of privacy in the contraband and thereby permitted the subsequent entry by a second government agent to do that which the first could have done. See *United States* v. *Jacobson*, 466 U.S. 109, 117, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984) ("[o]nce frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now nonprivate information"). The fact that the government agent who made the initial entry was a firefighter rather than a police officer is of no legal significance to a fourth amendment analysis. The subsequent limited entry by Lepore constituted no greater intrusion upon the defendant's privacy or possessory interest than did Marrero's entry and observation. Thus, the application of the rule adopted in *Magnano* to situations in which the initial entry is by a firefighter comports with the premise that underlies the plain view doctrine.

Furthermore, it would appear that no useful or beneficial purpose would be served by excluding evidence seized by a police officer who has stepped into the shoes of a firefighter. The entry and seizure by Lepore was limited to what Marrero had observed during his initial lawful entry.[11] Lepore's conduct was not a flagrant abuse of his presence as evidenced by the fact that he did not engage in a general search beyond the scope of Marrero's observation.[12] Suppressing this evidence

---

[11] Particularly of note, neither Marrero nor Lepore opened the second, closed cigar box that was adjacent to the open cigar box containing the drugs, because that box was not within the scope of Marrero's plain view observation.

[12] If Lepore had exceeded the scope of his lawful presence by, for example, opening the second cigar box, that would have been an unlawful search. The fact that he restrained himself from doing so demonstrates the lack of a flagrant abuse of his power. See *United States* v. *Green*, 474 F.2d 1385, 1390 (5th Cir.), cert. denied, 414 U.S. 829, 94 S. Ct. 55, 38 L. Ed. 2d 63 (1973).

will not encourage obtaining warrants, but will serve only to encourage the police to direct fire officials to seize the evidence themselves. A firefighter's lack of skill in evidence gathering and the resulting broken chain of custody, however, will undermine the legitimate police policies that we applauded in *Magnano*. *State* v. *Magnano*, supra, 204 Conn. 271. Even if the police do obtain a warrant, it will serve no beneficial purpose because the privacy that the warrant requirement protects already has been frustrated by the firefighter's plain view observation.[13]

Finally, we note that, although we previously have not addressed the specific issue of an initial exigent entry by firefighters who observe contraband followed by a subsequent entry and seizure of the contraband by police, other jurisdictions have addressed this precise factual situation. The overwhelming majority of courts

[13] The defendant asserts that if we fail to suppress the evidence seized by Lepore, we would be creating a new exception to the warrant requirement. He argues that "subsequent warrantless entries are only permitted when they are purposefully related to the emergency that authorized the initial warrantless entry." This clearly overstates the limitations of the plain view exception. The patrol officers who entered the defendant's home in *Magnano* did so to search for a burglar who was reported to be in the house. *State* v. *Magnano*, supra, 204 Conn. 262. We acknowledged that it was "undisputed that by the time the defendant had left the premises, the emergency had terminated" and that the detectives arrived after the defendant had been removed from the scene. Id. The detectives entered not to aid in the search for a burglar or to render aid to the victim, but for the express purpose of gathering evidence. Consequently, there is absolutely no merit in the defendant's contention that the subsequent entry must be limited only to the emergency purpose that permitted the initial entry. See *Michigan* v. *Tyler*, supra, 436 U.S. 508 (permitting firefighters to remain on premises for reasonable time to complete duties after fire suppressed, and upholding seizures made during that time); *State* v. *Bell*, supra, 108 Wash. 2d 198 (dismissing contention that exigency must last throughout duration of search and seizure). As did the patrol officers in *Magnano*, Marrero entered for an emergency purpose, namely, to search for victims and ventilate the room. Lepore's subsequent entry, while firefighters were still lawfully on the premises, was solely to gather the evidence found in plain view by Marrero during his lawful presence.

that have done so have concluded that the police may step into the shoes of the firefighter to seize the contraband without first obtaining a warrant. See *United States* v. *Green*, 474 F.2d 1385 (5th Cir.), cert. denied, 414 U.S. 829, 94 S. Ct. 55, 38 L. Ed. 2d 63 (1973); *United States* v. *Johnson*, supra, 524 F. Sup. 203–204; *Mazen* v. *State*, 940 P.2d 923 (Ariz. 1997); *People* v. *Harper*, 902 P.2d 842 (Colo. 1995); *State* v. *Loh*, 275 Mont. 460, 914 P.2d 592 (1996); *Commonwealth* v. *Person*, supra, 385 Pa. Super. 197; *Commonwealth* v. *Thornton*, 24 Va. App. 478, 483 S.E.2d 487 (1997); *State* v. *Bell*, supra, 108 Wash. 2d 193.[14] Other courts have found no fourth amendment violations in analogous situations where one government agent has observed evidence of contraband and members of a different agency have taken possession of the contraband without a warrant. See *United States* v. *Brand*, 556 F.2d 1312 (5th Cir. 1977), cert. denied, 434 U.S. 1063, 98 S. Ct. 1237, 55 L. Ed. 2d 763 (1978) (no warrant required when second group of police officers enter house to assist officer who entered to render emergency aid and second officers observe evidence in plain view); *Steigler* v. *Anderson*, 496 F.2d 793 (3d Cir.), cert. denied, 419 U.S. 1002, 95 S. Ct. 320, 42 L. Ed. 2d 277 (1974) (no warrant required when police officer seized evidence of arson found by state fire marshal during warrantless investigation after fire was controlled); *United States* v. *Gargotto*, 476 F.2d 1009 (6th Cir. 1973) (no warrant required when Internal Revenue Service obtained evidence of gambling activity that previously had been seized in arson investigation by investigator and police officer).

---

[14] In fact, our research reveals that only one court has concluded that a defendant retains a reasonable expectation of privacy after fire officials lawfully have entered the premises and discovered evidence in plain view. The Ninth Circuit Court of Appeals in *United States* v. *Hoffman*, 607 F.2d 280 (9th Cir. 1979), required a warrant prior to entry and seizure by the police of the shotgun found by firefighters while suppressing a fire in the defendant's residence. *Hoffman* is decidedly a minority approach and we do not find its rationale persuasive.

A review of those cases supports a conclusion that the fourth amendment does not require suppression of the illicit drugs seized by Lepore. In *Commonwealth* v. *Person,* supra, 385 Pa. Super. 199, firefighters observed drug paraphernalia "and a bag containing green matter" during the course of their lawful entry into the defendant's bedroom. The firefighters summoned the police from outside the apartment, and the police seized the contraband and drug paraphernalia. Id. The court concluded that "a fire[fighter] or fire marshall, who is properly inside premises in the course of his firefighting duties and responsibilities, may seize contraband or evidence of criminal activity other than arson which he inadvertently observes in plain view. Further, when contraband is observed in plain view by a fire marshall who is properly on the premises, he may summon a police officer who may observe and seize the contraband without a warrant." Id., 213. The court reasoned that "[i]t is only where a defendant's constitutional right to be free of unreasonable searches and seizures has been violated that suppression is required. There is no such violation where evidence of crime is inadvertently observed in plain view by a representative of the government who is lawfully in a position from which to make such observation." Id., 214–15; see also *People* v. *Harper,* supra, 902 P.2d 844–46 (no warrant required when police entered defendant's bedroom and seized marijuana and cocaine observed in plain view by firefighters during search for cause of fire);[15] *State* v. *Bell,* supra, 108 Wash. 2d 193 (no warrant required when sheriff's deputy entered defendant's attic and seized marijuana plants observed by firefighters in course of ventilating premises).

---

[15] Notably, the court concluded that the requirement that the evidentiary nature of the substance seized must be immediately apparent was satisfied by the police officer's determination of probable cause. *People* v. *Harper,* supra, 902 P.2d 846; see footnote 10 of this opinion. The court made no analysis of the independent probable cause of the firefighter who initially observed the marijuana.

As the court noted in *United States* v. *Green*, supra, 474 F.2d 1390,[16] "[t]he purpose of a search warrant is to ensure judicial authorization, in advance, of intrusions into constitutionally protected privacy. Where a lawful intrusion has already occurred and a seizure by a State officer has validly taken place as a result of that intrusion, the invasion of privacy is not increased by [allowing] an additional officer, albeit a federal officer, who is expert in identifying the type of contraband discovered, to enter the premises to confirm the belief of the State officer and to take custody of the evidence. Once the privacy of a dwelling has been lawfully invaded, to require a second officer from another law enforcement agency arriving on the scene of a valid seizure to secure a warrant before he enters the premises to confirm that the seized evidence is contraband and to take custody of it is just as senseless as requiring an officer to interrupt a lawful search to stop and procure a warrant for evidence he has already inadvertently found and seized. . . . The apparent conflict between the Constitution and common sense which the plain view doctrine has reconciled is the same misconception which we here seek to dispel." (Citations omitted.)

Marrero, an agent of the state, was lawfully present in the defendant's bedroom when he observed the substance that a reasonably prudent firefighter would have believed to be marijuana. He could have seized the

---

[16] In *Green*, the court concluded that no warrant was necessary when a fire marshal observed counterfeiting templates during his lawful presence in the residence, and subsequently contacted a Secret Service agent to make a positive identification and seize the plates. *United States* v. *Green*, supra, 474 F.2d 1390. Rather, the court noted that "[t]he facts of the case sub judice present a classic situation for application of the well established plain view doctrine." Id., 1389. The court reasoned that the fire marshal "surely could have removed the plates and carried them to the Secret Service's headquarters, or have handed them to [the Secret Service agent] outside of the apartment. Thus, [the Secret Service agent] cannot be constitutionally tripped up at the threshold that he stepped across to make his confirmation and to take custody of the plates from [the fire marshal]." Id., 1390.

contraband without first obtaining a warrant. *People* v. *Harper*, supra, 902 P.2d 842; *Commonwealth* v. *Person*, supra, 385 Pa. Super. 197; *Commonwealth* v. *Thornton*, supra, 24 Va. App. 478; *State* v. *Bell*, supra, 108 Wash. 2d 193; see *State* v. *Wilson-Bey*, supra, 21 Conn. App. 166–67. Instead, he called a police officer to confirm his belief rather than unnecessarily intruding upon the defendant's possessory interest. The defendant cannot reasonably argue that he retained an expectation of privacy after Marrero observed the marijuana. The suppression of such evidence would elevate form over substance and would undermine three decades of state and federal precedent that has sought to infuse logic and common sense into the exclusionary rule since its pronouncement by the United States Supreme Court in *Mapp* v. *Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

We conclude, therefore, that the rule that we adopted in *Magnano* applies in this case. Because Lepore's subsequent entry and seizure was merely an extension of Marrero's lawful presence in the defendant's bedroom and plain view observation of the marijuana in the cigar box, Lepore was not constitutionally required to obtain a warrant before seizing the cigar box. Consequently, the trial court improperly granted the defendant's motion to suppress the marijuana and cocaine seized by Lepore.

The judgment is reversed and the case is remanded to the trial court with direction to deny the motion to suppress, and for further proceedings according to law.

In this opinion BORDEN, NORCOTT, PALMER and MCDONALD, Js., concurred.

BERDON, J., with whom, KATZ, J., joins, dissenting. The majority today erodes the protection afforded by the fourth amendment to the United States constitution. In an offhand resolution of an issue that was neither

briefed nor argued before this court, the majority gives the following instruction to law enforcement officers: If you are lawfully present in a citizen's home, you may seize anything you can see, even if you have neither a warrant nor a reasonable belief that the item is probably contraband or other evidence of criminality (contraband). This instruction is as untenable as it is unprecedented. As I shall point out in this dissent, the majority's decision presents four problems: (1) it contradicts a perfectly clear holding by the United States Supreme Court; (2) it disregards the theoretical underpinnings of the plain view exception to the constitutional requirement that the police must obtain warrants from detached and neutral magistrates; (3) it provides officers with an incentive to break the law, thus turning the fundamental fourth amendment principle of deterrence on its head; and (4) it contradicts our own prior jurisprudence of plain view seizures.

## I

Before turning to the merits of the majority's position, it is first necessary to underscore the fact that the rule created today addresses an issue that neither party has ever raised, either before this court or before the trial court.[1] In other words, the majority decides the present appeal on the basis of an argument that it has devised on behalf of the state. Both the constitution and basic principles of decency should compel this court to afford the defendant an opportunity to respond to this argument, which may very well result in his incarceration upon remand.[2]

---

[1] Moreover, under the terms of the majority's argument, this new rule is not necessary to the resolution of any issue presented by this case. See footnote 3 of this dissent.

[2] I wish to emphasize that the defendant is not completely foreclosed from responding to the argument that the majority has devised. The majority has limited itself to addressing what it believes the federal constitution requires. Accordingly, the defendant remains free to pursue an argument before the trial court on remand that the evidence must be suppressed under our state constitution, which extends greater protection of privacy in the

More importantly, the defendant has not had any opportunity to present evidence relevant to the majority's new rule. Under our law as it existed up until today, it was necessary for the state to prove as a threshold matter that the officer subjectively believed—based upon probable cause—that an item discovered in plain view was contraband. In the present appeal, the state failed to satisfy its burden of proving that firefighter Angel Marrero possessed the requisite level of suspicion, and the trial court suppressed the fruits of the search. Now, the majority holds that the trial court should have disregarded the fact that Marrero did not believe that he possessed probable cause to seize the cigar box from the defendant's bedroom.[3] In other

home than does its federal counterpart. See *State* v. *Geisler*, 222 Conn. 672, 686–90, 610 A.2d 1225 (1992) (setting forth method by which litigant should raise cognizable claim under state constitution).

[3] In footnote 10 of its opinion, the majority claims that Marrero "had a firm, but not absolute, belief that the substance in the cigar box was marijuana," then concludes that this "belief" rises to the level of probable cause. This is simply not true, for two reasons.

To begin with, Marrero's testimony and the court's express factual finding supply persuasive evidence that Marrero did not subjectively believe that he had probable cause. According to the trial court, "Marrero, in his own words, testified that when he saw the open cigar box in [the] defendant's bedroom he thought, 'Not being an expert, but *I had a question in my mind* if it happened to be marijuana.' [Marrero] also admitted to having no training in identifying drugs. Nor did [the lead officer on the scene] believe [Marrero] to be so trained. No evidence was presented to indicate any familiarity on [Marrero's] part with the appearance or physical characteristics of marijuana or other drugs. In short, there is no evidence that [the lead officer] entered the house on anything more than the possibility the cigar box contained drugs." (Emphasis added.) The trial court—which had the unique opportunity to observe Marrero in person as he testified—found that Marrero did *not* "firmly believe" that he had probable cause. Instead, the trial court found that Marrero believed merely that there was a "possibility [that] the cigar box contained drugs." The majority's attempt to extract the contrary proposition from the cold record before us is unavailing.

Second, the majority's finding that Marrero "had a firm . . . belief" that he had probable cause disregards our standard of review. "[O]ur power to upset the findings of the trial court is limited. We have stated our function here on many occasions. 'On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. See

words, the majority has decided to employ nothing more than an objective test, one that focuses exclusively upon the hypothetical construct of a "reasonable firefighter." Although the majority seems to believe that such a reasonable firefighter theoretically could have concluded that the leafy substance was probably marijuana, it is impossible to evaluate the accuracy of this assertion on the basis of the cold record before us. See *State* v. *Reddick*, 207 Conn. 323, 335, 541 A.2d 1209 (1988) (ordering new suppression hearing to determine, inter alia, "whether [the] evidentiary value [of an item found in plain view] was immediately apparent to the officer who discovered it"). Drawing upon nothing but its own advocacy on behalf of the state, the majority substantially has eroded the right of privacy under the federal constitution.

By resolving this case in the way that it does, the majority of this court violates the defendant's right to due process. As former Chief Justice Peters cogently explained more than one decade ago in an analogous case, "we must take into account the significant constitutional role that trial courts play in protecting the rights guaranteed both by the fourth amendment of the United States constitution and by article first, § 7, of the Connecticut constitution. To resolve the competing interests of the police and those whom they accuse of

Practice Book, 1978, § 3060D. This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, they are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court. Beyond that, we will not go.' *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980)." *State* v. *Zindros*, 189 Conn. 228, 238, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984). The majority disregards the findings that the trial court made; it has not supplied any reason to believe that these findings were clearly erroneous.

criminal activity, we have come to rely heavily on the critical judgment of trial courts for impartial findings of probable cause to search, to arrest, and to obtain a warrant. *State* v. *Badgett,* 200 Conn. 412, 429, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986); *State* v. *Heinz,* 193 Conn. 612, 624, 480 A.2d 452 (1984); *State* v. *Zindros,* 189 Conn. 228, 236–37, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984); *State* v. *Federici,* 179 Conn. 46, 53–54, 425 A.2d 916 (1979). When the trial court has exercised the authority thus conferred upon it, either expressly or implicitly, we have usually deferred to its judgment. . . .

"The position taken by the majority . . . deprives the defendant of his due process right to notice and a fair opportunity to be heard. See *Cole* v. *Arkansas,* 333 U.S. 196, 201, 68 S. Ct. 514, 92 L. Ed. 644 (1948); *Paulsen* v. *Manson,* 203 Conn. 484, 490, 525 A.2d 1315 (1987); *State* v. *Franko,* 199 Conn. 481, 491–92, 508 A.2d 22 (1986). Had the trial court focused its attention on whether [a reasonable officer would have believed] there was probable cause . . . [the defendant] might then have been able, by cross-examination or by witnesses of his own, to refute the testimony that the majority now finds dispositive. See *State* v. *Kimbro,* 197 Conn. 219, 228, 496 A.2d 498 (1985). A remand would give the defendant his day in court on this issue." (Citations omitted.) *State* v. *Copeland,* 205 Conn. 201, 214–16, 530 A.2d 603 (1987) (*Peters, J.,* dissenting).

## II

When applying the principles of our fourth amendment jurisprudence to the facts of the present case, it is critical to keep in mind that the officer in the present case seized a personal possession from a citizen's home. We have long acknowledged that "[e]ntry by the government into a person's home . . . is the chief evil against

which the wording of the Fourth Amendment is directed. *Payton* v. *New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)." *State* v. *Geisler*, 222 Conn. 672, 681, 610 A.2d 1225 (1992). Accordingly, "warrantless searches and seizures inside a home are presumptively unreasonable . . . and the state bears the burden of showing that an exception to the warrant requirement exists. . . . [A]bsent consent to entry or exigent circumstances, a judicial determination of probable cause must stand in between the police and the door of a person's home . . . ." (Citations omitted; internal quotation marks omitted.) Id., 682.

This robust protection finds its roots in the fundamental importance of the home as the locus of privacy. "The sanctity of the home has a well established place in our jurisprudence. The English common law, upon which much of this country's constitutional and common law is based, recognized that intrusion into the home constituted especially egregious conduct. 'From earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an arrest. Such action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle. As early as the 13th Yearbook of Edward IV (1461–1483), at folio 9, there is a recorded holding that it was unlawful for the sheriff to break the doors of a man's house to arrest him in a civil suit in debt or trespass, for the arrest was then only for the private interest of a party. Remarks attributed to William Pitt, Earl of Chatham, on the occasion of debate in Parliament on the searches incident to the enforcement of an excise on cider, eloquently expressed the principle: "The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the

threshold of the ruined tenement!" ' *Miller* v. *United States,* 357 U.S. 301, 306–307, 78 S. Ct. 1190, 2 L. Ed. 2d 1332 (1958). In discussing burglary, defined as 'nocturnal house-breaking,' Blackstone wrote, '[a]nd the law of England has so particular and tender a regard to the immunity of a man's house, that it styles it his castle, and will never suffer it to be violated with impunity . . . .' 4 Blackstone's Commentaries (1822) p. 222." *State* v. *Geisler,* supra, 222 Conn. 687–88.

Notwithstanding our long tradition of vigilantly safeguarding the sanctity of the home, the majority holds that "we need only look to the evidence presented relating to [the officer's] knowledge and to determine whether, on the basis of that knowledge, a reasonable person would have had probable cause" to seize a particular personal possession from a citizen's home. According to the majority, in other words, the fact that an officer does not believe that he has probable cause (and, therefore, believes that he is violating the constitution) will not invalidate a seizure if the reviewing court determines that a hypothetical "reasonable officer" would have had probable cause. As one commentator has critically described this position, the majority seems to believe that "fourth amendment restraints upon law enforcement officers' exercise of discretionary authority to search for (or seize) evidence are nonexistent as long as a lawful-sounding 'cover story' for a given search or arrest can be concocted . . . ." J. Burkoff, "The Pretext Search Doctrine: Now You See It, Now You Don't," 17 U. Mich. J.L. Reform 523, 524 (1984). The majority does not cite a single case that supports its terrifying conclusion.[4] Indeed, the majority must ignore

---

[4] Before announcing its new rule, the majority quotes dicta from *Horton* v. *California,* 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). Because the officer in *Horton* subjectively believed that he had probable cause to seize the relevant items; see footnote 21 of this dissent; the Supreme Court did not even consider the question that the majority has raised in the present appeal, let alone resolve it. Instead, the sole issue that the court addressed in *Horton* was "[w]hether the warrantless seizure of evidence of crime in

## clear precedent from the United States Supreme Court in order to reach its result.

plain view is prohibited by the Fourth Amendment if the discovery of the evidence was not inadvertent." Id., 130. It is apparent that the holding of *Horton* has absolutely nothing to do with the principle that an officer cannot seize an item from a citizen's home without a warrant unless he subjectively believes that he has probable cause to do so.

In the string cite following its quotation of dicta from *Horton*, the majority lists three other cases from the United States Supreme Court. Like *Horton*, these cases are inapposite, because the officers subjectively believed that they had the requisite level of suspicion. See *Whren* v. *United States*, 517 U.S. 806, 819, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); *Ornelas* v. *United States*, 517 U.S. 690, 699–700, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996); *Maryland* v. *Macon*, 472 U.S. 463, 465, 105 S. Ct. 2778, 86 L. Ed. 2d 370 (1985). Significantly, the challenged activity in one of these cases did not even implicate the fourth amendment. See *Maryland* v. *Macon*, supra, 467.

Moreover, not one of these cases involves a search that invaded the sanctity of the home, "the chief evil against which the wording of the Fourth Amendment is directed." (Internal quotation marks omitted.) *State* v. *Geisler*, supra, 222 Conn. 681; see *Payton* v. *New York*, supra, 445 U.S. 585. *Macon* involved a bookstore, in which the "respondent [cashier] did not have any reasonable expectation of privacy . . . ." *Maryland* v. *Macon*, supra, 472 U.S. 469. The remaining cases involved searches of vehicles. It is well settled that "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home . . . . *California* v. *Carney*, 471 U.S. 386, [391] 105 S. Ct. 2066, 85 L. Ed. 2d 406 (1985) . . . ." (Citations omitted.) *State* v. *Badgett*, 200 Conn. 412, 428, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986); accord *State* v. *Miller*, 227 Conn. 363, 385, 630 A.2d 1315 (1993) ("[t]he balance between law enforcement interests and individuals' privacy interests . . . tips in favor of law enforcement in the context of an on-the-scene automobile search"); *State* v. *Pittman*, 209 Conn. 596, 602, 553 A.2d 155 (1989) ("there is a diminished expectation of privacy in an automobile" [citing cases from United States Supreme Court]); *State* v. *Januszewski*, 182 Conn. 142, 155–56, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981) ("because a person's expectation of privacy in an automobile is significantly less than one's expectation of privacy in his home . . . resort to the judicial process prior to the search of an automobile is often not required").

The Supreme Court of the United States has never held that an officer who is present in a citizen's home without a warrant may seize any item that he discovers in plain view, even if he believes that he does not have probable cause to do so. In other words, the Supreme Court has never given its imprimatur to evidence seized by an officer who believed that he was violating the constitution. Instead of acknowledging this indisputable fact, the majority takes dicta out of context in order to provide the semblance

In *Arizona* v. *Hicks*, 480 U.S. 321, 107 S. Ct. 1149, 94
L. Ed. 2d 347 (1987), the United States Supreme Court

of support for the contrary proposition. A close examination of the authority relied upon by the majority reveals that not one of these cases stands for the proposition for which it is cited.

The majority observes that the Supreme Court in *Horton* "not[ed] that 'evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.'" In context, all this means is that an officer's subjective belief that he would find an item in plain view—even though it was not described in the warrant—does not require suppression of that item. *Horton* v. *California*, supra, 496 U.S. 138–39 ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer. The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure . . . . [If an officer] has a valid warrant to search for one item and merely a suspicion [that he will find] the second, whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first."). This principle has nothing to do with the facts of the present appeal.

The majority culls the following language out of *Whren*: "'subjective intentions play no role in ordinary, probable-cause fourth amendment analysis.'" The officer in *Whren* subjectively believed that he had probable cause to stop an automobile because the driver had violated the traffic code. *Whren* v. *United States*, supra, 517 U.S. 819. In the course of this stop, the officer discovered illegal drugs. Id., 809. The court held that the possibility that the officer may have suspected that the car contained narcotics did not require suppression of the evidence. Id., 813. This holding has nothing to do with the facts of the present appeal.

The majority cites *Ornelas* for the proposition that "probable cause is based upon an evaluation of the 'facts, viewed from the standpoint of an objectively reasonable police officer' . . . ." In *Ornelas*, the Supreme Court granted certiorari for the sole purpose of determining whether an appellate court should review findings of probable cause deferentially or de novo. *Ornelas* v. *United States*, supra, 517 U.S. 695. The court did not discuss whether a reasonable officer would have believed that he had probable cause to engage in the underlying search. More to the point, the court did not so much as mention the possibility that the officer who actually conducted the search might not have believed that he possessed probable cause to do so. To the extent that the quoted language has anything at all to do with the present appeal, it simply means that an officer's subjective belief that he has probable cause is not *sufficient* to ensure the admissibility of the evidence. In addition, the officer's subjective belief must reflect "the standpoint of an objectively reasonable police officer . . . ." Id., 696; see

considered and rejected the rule that my colleagues in the majority have devised.[5] The state in *Hicks* conceded

footnote 22 of this dissent. In other words, the dicta that the majority extracts from *Ornelas* does not mean that subjective good faith is not *necessary*.

Finally, the majority quotes the following language from *Macon*: "[W]hether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time . . . and not on the officer's actual state of mind at the time the challenged action was taken." (Internal quotation marks omitted.) *Maryland* v. *Macon*, supra, 472 U.S. 469. As I stated previously, *Macon* does not even implicate the fourth amendment. In *Macon*, an undercover police officer used a marked $50 bill to purchase obscene materials from a store that regularly carried such merchandise. Id., 465. The respondent cashier "argue[d] that the bona fide nature of the purchase evaporated when the officers . . . seized the marked $50 bill [for evidentiary purposes] and failed to return the change. . . . When the officer subjectively intends to retrieve the money while retaining the magazines, [the] respondent maintain[ed], the purchase is tantamount to a warrantless seizure." (Citation omitted.) Id., 470. The court rejected this argument, explaining that "[w]hether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time . . . and not on the officer's actual state of mind at the time the challenged action was taken. . . . Objectively viewed, the transaction was a sale in the ordinary course of business. The sale is not retrospectively transformed into a warrantless seizure by virtue of the officer's subjective intent to retrieve the purchase money to use as evidence." (Citations omitted; internal quotation marks omitted.) Id., 470–71. In short, the court held that an officer's subjective intention to execute a sting operation does not magically confer upon the target any special fourth amendment immunity. This holding has nothing to do with the facts of the present appeal.

Elsewhere in its opinion, the majority cites four cases from the lower federal courts. See footnote 10 of the majority opinion. In my view, not one of these cases avails the majority. Even if any of these opinions did provide support for the majority's erosion of the jurisprudence of the United States Supreme Court, we should not compound such an error.

[5] In *Arizona* v. *Hicks*, supra, 480 U.S. 323–24, "a bullet was fired through the floor of [the defendant's] apartment, striking and injuring a man in the apartment below. Police officers arrived and entered [the defendant's] apartment . . . . They found and seized three weapons, including a sawed-off rifle . . . . One of the policeman . . . noticed two sets of expensive stereo components, which seemed out of place in the squalid and otherwise ill-appointed four-room apartment. Suspecting that they were stolen, he read and recorded their serial numbers—moving some of the components, including a Bang and Olufsen turntable—in order to do so—which he then reported by phone to his headquarters. On being advised that the turntable

that the police officer who seized items from a citizen's home "had only a 'reasonable suspicion' . . . [i.e.] something less than probable cause."[6] Id., 326. The trial court suppressed the evidence, and the Court of Appeals and the Supreme Court both affirmed. Id., 324,

---

had been taken in an armed robbery, he seized it immediately. . . . [The defendant] was subsequently indicted for the robbery."

[6] As authority for this concession, the *Hicks* court cited to the brief of the petitioner, wherein the state expressly conceded that "[the police officer] lacked probable cause . . . ." Petitioner's Brief, p. 18, *Arizona* v. *Hicks*, supra, 480 U.S. 321 (Docket No. 85-1027). More fully, the state explained that "[t]he critical question presented here is to what extent reasonable suspicion will justify [the police officer's] inspection of the stereo . . . . [He] testified that the stereo unit looked suspicious, and out of context with the low-rent, ill-kept apartment. He did not, however, immediately connect the stereo component with evidence of a specific crime." Id., pp. 17–19. It is apparent that this concession and the attendant explanation focus upon the police officer's subjective perceptions, not those which might be ascribed to a hypothetical "reasonable officer." It is equally apparent that the state in *Hicks* conceded that the police officer did not subjectively believe that he had probable cause.

Moreover, the record before the Supreme Court makes it unambiguously clear that the police officer did not subjectively believe that he had probable cause. If there were any doubt about this conclusion, the officer's own testimony would be sufficient to dispel it. In the joint appendix that they submitted to the Supreme Court, the parties included a transcript of the suppression hearing. Joint Appendix, pp. 12–30, *Arizona* v. *Hicks*, supra, 480 U.S. 321 (Docket No. 85-1027). This transcript includes the following testimony by the police officer: "[A]s soon as I entered in the living room area I noticed that there was a stereo set up along the east wall. But it was after I had been to the bedroom and found the guns that I decided to—I was going to check the serial number on the guns. So then I said, well, as long as I am checking serial numbers, I may as well check the serial numbers on the stereo items too." Id., p. 16.

The transcript of the suppression hearing also includes the following cross-examination of the police officer by defense counsel:

"Q. What was it about the Bang and Olufsen turntable that made you pick it up or lift it to take the serial numbers off?

"A. Because it was an item of value. In over twelve years of police experience I know those things are stolen a lot and I just decided to check the serial numbers.

"Q. So you just were curious, is that it?

"A. Well, I was suspicious, you know. . . . I was just suspicious.

"Q. Was there anything about that Bang and Olufsen receiver that would

329. In her dissenting opinion, Justice O'Connor offered her view that the items were admissible, for the following reason: based upon the facts found, a reasonable officer would have had probable cause to seize them.[7] Id., 339. In an asterisked footnote, the majority of the court rejected this argument. Id., 326. The majority thereby held that a search conducted by an officer who does not have probable cause to invoke the plain view

---

have led you to believe or have a reasonable belief that it was stolen?

"A. Not until I had the serial number verifying that it was stolen.

"Q. And what about the other equipment that you lifted or turned to get the serial numbers on? Was there any reason to believe any of this equipment was stolen?

"A. No, just merely—I was really suspicious, you know. They were nice equipment but, you know—

"Q. So the fact is that you were just seeing what you could find there; is that correct, in the apartment, and check[ing] any serial numbers that you could to see if you could locate any stolen property; is that correct?

"A. That's correct.

\* \* \*

"Q. And I believe you have already answered the question that it wasn't immediately apparent to you that anything was stolen in that apartment; is that correct? You already answered that?

"A. I believe that's correct. I was just suspicious." Id., pp. 22–23, 26.

[7] In her dissent, Justice O'Connor concludes that the probable cause standard "*was satisfied* here. When *police officers*, during the course of a search inquiring into grievously unlawful activity, discover the tools of a thief (a sawed-off rifle and a stocking mask) and observe in a small apartment two sets of stereo equipment that are both inordinately expensive in relation to their surroundings and known to be favored targets of larcenous activity, the flexible, commonsense standard of probable cause *has been satisfied.* . . . [T]he Court today ignores *the existence of probable cause* . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) *Arizona* v. *Hicks*, supra, 480 U.S. 339; see footnote 6 of this dissent for a more detailed recitation of the facts of *Hicks*. As the emphasized language makes clear, Justice O'Connor defines probable cause by invoking the hypothetical beliefs of an objective reasonable officer. Using the passive voice, she speaks of the philosophical "existence of probable cause" (which, she claims, "was satisfied" and "has been satisfied" in *Hicks*), and invokes the hypothetical construct of generic "police officers." Id. (O'Connor, J., dissenting). The state's concession—that the officer who actually conducted the search in *Hicks* "had only a 'reasonable suspicion' . . . [i.e.] something less than probable cause"; id., 326;—does not appear in Justice O'Connor's reasoning.

doctrine violates the federal constitution.[8] Id. More fully, the majority explained in that same footnote that, "[c]ontrary to the suggestion in Justice O'Connor's dissent . . . [the state's] concession [that the officer who conducted the search did not subjectively believe that he had probable cause] precludes our considering whether the probable-cause standard was satisfied in this case." (Citation omitted.) Id., 326. If the only relevant inquiry were whether an objectively reasonable officer would have had probable cause, then the state's concession—which was limited exclusively to the state of mind of the officer who actually conducted the search—would have been irrelevant. In my view, the majority of the Supreme Court made it clear that the bad faith of the searching officer was, in fact, fatal to the admissibility of the evidence.

If there were any question about the holding of *Hicks*, it was put to rest three years later in *Horton* v. *California*, 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). In *Horton,* the Supreme Court explained in unmistakably declarative language that the "incriminating character [of an item] *must . . . be* immediately apparent" to the searching officer.[9] (Emphasis added; internal quotation marks omitted.) Id., 136; accord *Ornelas* v. *United States,* supra, 517 U.S. 699–700 ("[A] police officer *views the facts* through the lens of *his* police experience and expertise. . . . [A] police officer may *draw inferences* based on *his own experience* in *deciding* whether probable cause exists." [Emphasis added.]); *Coolidge* v. *New Hampshire,* 403 U.S. 443, 466,

---

[8] As one commentator has aptly put it, there is no good reason to place any stock in a fictive construct of probable cause that, "unbeknownst to the searching officer 'objectively' exist[ed] elsewhere in the universe." J. Burkoff, "Bad Faith Searches," 57 N.Y.U. L. Rev. 70, 105 (1982).

[9] Elsewhere, the *Horton* court concluded that "[i]t was immediately apparent *to the officer* that [the items in plain view] constituted incriminating evidence." (Emphasis added.) *Horton* v. *California,* supra, 496 U.S. 142; see also footnote 21 of this dissent.

91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) ("the extension of the original justification [for an intrusion into a citizen's home] is legitimate only where it is immediately apparent to the police that they have [contraband] before them"). This conclusion stems from "[t]he premise . . . that any intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a *careful prior determination of necessity*." (Emphasis added.) *Coolidge* v. *New Hampshire*, supra, 467. Unless the searching officer subjectively believes that he has probable cause (and, therefore, believes that a particular seizure does not violate the constitution), there is no such "careful . . . determination of necessity."[10] Id.

Furthermore, the majority's new rule ignores the analytic framework that the Supreme Court employed in *Hicks*. Following the model set forth by the *Hicks* court, I now turn to the "theoretical and practical moorings" of the plain view doctrine.[11] *Arizona* v. *Hicks*, supra, 480 U.S. 326. The theory underlying the plain view doctrine is "the premise that the police need not ignore *incriminating evidence in plain view* while they are . . . entitled to be in a position to view the items seized." (Emphasis added.) *State* v. *Ruth*, 181 Conn. 187, 193, 435 A.2d 3 (1980); see *Coolidge* v. *New Hampshire*, supra, 403 U.S. 468 ("it would often be a needless inconvenience, and sometimes dangerous . . . to require

[10] Nevertheless, as I shall point out later in this dissent, the perspective of a reasonable officer is not irrelevant. Once a court has determined that the searching officer subjectively believed that he had probable cause, the court must then determine whether this belief is objectively reasonable. See footnote 22 of this dissent.

[11] The *Hicks* court discussed the "theoretical and practical moorings" of the plain view doctrine; *Arizona* v. *Hicks*, supra, 480 U.S. 326; in order to explain its holding that "probable cause [as opposed to reasonable suspicion] is required in order to invoke the 'plain view' doctrine." Id. Although this holding addresses a somewhat different issue than the one that we are called upon to resolve in the present case, the analytic framework that the Supreme Court used in *Hicks* to determine the level of suspicion required to justify a warrantless home seizure is nevertheless instructive in the present case.

[the police] to ignore [contraband] until they have obtained a warrant particularly describing it"). To parse the emphasized language from *Ruth*, a citizen's personal possessions are not either "incriminating" or "in plain view" in the same way that water is wet. It is for this reason that the entire justification for the warrantless seizure of items from a citizen's home would evaporate if the requisite criteria were evaluated solely from the perspective of a hypothetical "reasonable officer." As one commentator has explained, "the answer to the question of whether an object is in plain view—and the similar question of whether an object's incriminating nature is immediately apparent—depends on the subjectivity of the observer. . . . [W]hen a police officer determines first that an item is in plain view and second that the item's incriminating nature is immediately apparent, the officer is engaging in an act of interpretation." D. Gunter, "The Plain View Doctrine and the Problem of Interpretation: The Case of *State* v. *Barnum*," 75 Or. L. Rev. 577, 601 (1996). In other words, the theory underlying the plain view doctrine is predicated upon two threshold criteria—the items must be "incriminating" and "in plain view"—each of which is irreducibly subjective.[12]

---

[12] The *Hicks* court explained that "[d]ispensing with the need for a warrant is worlds apart from permitting a lesser standard of cause for the seizure than a warrant would require, i.e., the standard of probable cause. No reason is apparent why an object should routinely be seizable on lesser grounds, during an unrelated search and seizure, than would have been needed to obtain a warrant for that same object if it had been known to be on the premises." *Arizona* v. *Hicks*, supra 480 U.S. 327.

In the present case, we must not lose sight of the fact that the plain view doctrine is an *exception* to the fundamental fourth amendment rule that a police officer without a warrant cannot invade a citizen's home and seize his personal possessions. At its core, a warrant is a legal document attesting to the fact that a judicial officer subjectively believes that a particular seizure is supported by probable cause and, therefore, does not violate the constitution. This constitutional protection is wholly absent when determinations of probable cause are made by police officers in the heat of the "often competitive enterprise of ferreting out crime"; (internal quotation marks

The subjective nature of the plain view doctrine is also reflected in "the premise that the police need not *ignore* incriminating evidence in plain view while they are . . . entitled to be in a position to view the items seized." (Emphasis added.) *State* v. *Ruth*, supra, 181 Conn. 193. It makes no sense to speak of an officer "ignoring" an item that he has probable cause to seize (i.e., an item that he believes is both incriminating and in plain view) if he does not, in fact, believe that he has probable cause to seize it. Unless the officer subjectively believes that he may seize a personal possession from a citizen's home without violating the constitution, the theory underlying the plain view doctrine mandates that he must ignore it, just as a magistrate would have to do upon reaching the analogous conclusion.

Turning to the practical consequences of the majority's new rule, I can imagine few things more abhorrent than the specter of an officer of the law standing in a citizen's home, free to seize anything he can see if he has a hunch that it might be contraband. It is no overstatement to observe that such a regime extinguishes

omitted.) *Terry* v. *Ohio*, 392 U.S. 1, 12, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); rather than by detached and neutral magistrates in the relative tranquility of their chambers. In the words that the court used in *Hicks*, "[d]ispensing with the need for a warrant is worlds apart from" dispensing with this fundamental principle that the police may not seize an item from a citizen's home unless the agent of the state who authorizes the seizure subjectively believes that the action is legally justified. *Arizona* v. *Hicks*, supra 480 U.S. 327. "No reason is apparent why an object should routinely be seizable on lesser grounds [i.e., without any subjective determination that probable cause exists] . . . than would have been needed to obtain a warrant . . . ." Id. "To say otherwise would be to cut the 'plain view' doctrine loose from its theoretical and practical moorings" as an exception to the presumption that an officer violates the constitution by seizing an item from a citizen's home without first obtaining a warrant. Id., 326. Accordingly, the court's reasoning in *Hicks* supplies ironclad support for the proposition that "plain view" refers to the subjective viewpoint of the searching officer, who must (1) view an item and (2) subjectively believe that he has probable cause to seize it.

much of the cherished privacy associated with the home, and verges on the brink of totalitarianism. Nevertheless, this is precisely the regime that my colleagues have created. Simply put, the majority of this court has authorized officers of the law to seize personal items from the homes of citizens, and it has not counterbalanced this terrifying power by requiring the officers to believe that they possess probable cause to commit such profound invasions of personal privacy.

In the wake of the opinion that my colleagues have rendered today, the police will not be deterred from seizing personal possessions from the homes of citizens, even if they believe that a particular seizure is not justified by either a warrant or an exception to the warrant requirement. In fact, the majority has unwittingly created a perverse incentive: an officer motivated by whim (or, perhaps, by racial animus) should go ahead and seize a personal possession from a citizen's home, in the hope that a clever prosecutor may be able to concoct an argument that creates the semblance of probable cause from clues upon which a so-called "reasonable officer" could have relied. In short, the police now have permission to act upon the most chimerical or venomous of motives.[13] This is the precise evil that the exclusionary rule was designed to prevent.

Like our federal counterparts, we have long held that the fruits of a warrantless plain view seizure must be suppressed unless the officer who viewed the contraband—as opposed to a hypothetical "reasonable officer"—possessed a good faith belief that the seizure was justified by probable cause. Two decades ago, this court

---

[13] Most of this activity will not uncover the slightest evidence of wrongdoing. See, e.g., D. Gunter, supra, 75 Or. L. Rev. 603 ("[m]ost suspicionless searches fail to reveal any evidence [of illegality]"); D. Harris, "On Race, Place and Being a Suspect," Natl. L.J. (November 1, 1993) pp. 15–16.

stated that courts must exclude such evidence unless "the incriminatory nature of the [evidence] was immediately apparent *to the searching officer*."[14] (Emphasis added; internal quotation marks omitted.) *State* v. *Onofrio*, 179 Conn. 23, 40, 425 A.2d 560 (1979). More recently, this court unanimously ordered a new suppression hearing to determine, inter alia, "whether [the] evidentiary value [of an item found in plain view] was immediately apparent *to the officer who discovered it*." (Emphasis added.) *State* v. *Reddick*, supra, 207 Conn. 335. Significantly, the court did not state in either *Onofrio* or *Reddick* that the evidence "would have been apparent *to a reasonable officer*," or even that it "*could* have been apparent to the searching officer."[15] Instead, the court stated in unmistakably declarative language that the incriminating nature of an item must—in fact— "[*be*] immediately apparent to the officer who discov-

---

[14] Curiously, the majority appears to concede that we must ask "whether it was immediately apparent *to Marrero* that the cigar box contained contraband . . . ." (Emphasis added.) The majority declines, however, to answer this question. Instead, the majority frames and answers a very different inquiry: "whether . . . a reasonable person would have had probable cause to believe that the green, leafy substance . . . was marijuana."

[15] *Onofrio* and *Reddick* are the only cases in which we have discussed the "immediately apparent" aspect of the plain view doctrine. In the analogous context of patdown searches, the majority of this court has stated that "[t]he incriminating nature of a nonthreatening object felt during a patdown search must be immediately apparent; *the police officer who conducts the search* cannot manipulate the object to discern its identity. . . . In addition, the officer's *belief* that the object is contraband must be objectively reasonable in light of all of the circumstances *known at the time of the search*. The conclusion *drawn by the officer* that an object is contraband is subject to judicial review of the reasonableness of that conclusion and of the officer's compliance with established constitutional requirements." (Citation omitted; emphasis added.) *State* v. *Trine*, 236 Conn. 216, 233–34, 673 A.2d 1098 (1996). As the emphasized language makes clear, the majority in *Trine* focused upon the subjective motivation of the actual officer conducting the search, not the hypothetical motivation that might be ascribed to an imaginary "reasonable officer." For a brief overview of the patdown search doctrine, see footnote 17 of this dissent.

ered it."[16] (Emphasis added.) Id.; *State* v. *Onofrio*, supra, 40. The majority simply ignores this language.

Other jurisdictions agree that a seemingly lawful search may violate the constitution if the searching officer did not possess the requisite level of suspicion. See, e.g., *People* v. *Velleff*, 94 Ill. App. 3d 820, 823, 419 N.E.2d 89 (1981) ("[P]robable cause requires both an objective and subjective test. . . . [W]e have found no case in which probable cause has been found for a search on objective facts where the officer testifies that he, in fact, did not believe . . . at the time of the search that a crime had been committed." [Citation omitted.]); *DiPasquale* v. *State*, 43 Md. App. 574, 578, 406 A.2d 665 (1979) ("The subjective belief in the officer's mind is critical, for the entire thrust of the Fourth Amendment and its exclusionary rule is aimed at the reasonableness of police conduct. It is true that even a bona fide belief on the part of the policeman is never enough, standing alone, to justify a Fourth Amendment intrusion; we must still measure whether such a subjective belief was reasonable. The actual, subjective belief, however, is the indispensable starting point. Even though it is not a sufficient condition, it is a necessary condition."); *People* v. *Davenport*, 99 Mich. App. 687, 691, 299 N.W.2d 368 (1980) ("The facts must be sufficient to create an honest belief in the mind of a reasonable and prudent man . . . . Not only must the facts be sufficient, but they must create an actual belief in the mind of the arresting officer." [Citation omitted.]); *State* v. *Ercolano*, 79 N.J. 25, 39, 397 A.2d 1062 (1979) ("the intent and purpose of the searching officers may be material, indeed crucial, to the validity of the search").

As previously discussed, the majority of the United States Supreme Court has squarely rejected Justice

---

[16] As discussed previously, the United States Supreme Court has employed this identical language. See footnote 9 of this dissent.

O'Connor's dissenting view in *Arizona* v. *Hicks*, supra
480 U.S. 339, that evidence need not necessarily be
suppressed if the searching officer subjectively believed
that he was violating the constitution by seizing it. In
order to salvage its attempt to resurrect Justice O'Con-
nor's argument in *Hicks*, the majority mischaracterizes
the import of this court's recent statement in *State* v.
*Trine*, 236 Conn. 216, 237, 673 A.2d 1098 (1996),[17] that
" '[t]he probable cause test . . . is an objective one.' "
The majority reads *Trine* for the proposition that it
makes absolutely no difference whether the incriminat-
ing nature of the evidence was immediately apparent
to the officer who discovered it, provided a hypothetical
"reasonable officer" might have determined that proba-
ble cause existed.[18]

---

[17] *Trine* involved a "patdown" search. "Under the fourth amendment to
the United States constitution and under article first, § 7, and article first,
§ 9, of the Connecticut constitution, a police officer may briefly detain an
individual for investigative purposes if the officer has a reasonable and
articulable suspicion that the individual has committed or is about to commit
a crime. . . . If, during the course of a lawful investigatory detention, the
officer reasonably believes that the detained individual might be armed and
dangerous, the officer may undertake a patdown search of the individual
to discover weapons. . . . Because a patdown search is intended to secure
the safety of the investigating officer, it is strictly limited to a search for
weapons." (Citations omitted.) *State* v. *Trine*, supra, 236 Conn. 223–24.

[18] In addition to contradicting the United States Supreme Court's decision
in *Hicks* and overruling our own decisions in *Onofrio* and *Reddick* sub
silentio, this approach begs the following question, posed by a leading
commentator on the fourth amendment: "[I]f it is legitimate to demonstrate
[bad faith] indirectly through inference, why should evidence be deemed
irrelevant and inadmissible which establishes the same [motivation] directly,
e.g., from the searching officer's testimony as to what he or she was really
doing and why he or she did it?" J. Burkoff, supra, 17 U. Mich. J.L. Reform 526.

The majority does not discuss *why*, precisely, our law provides that war-
rantless searches that are not justified by an objective quantum of probable
cause violate the constitution. At least one reason is quite simple: it is often
difficult to discern the intent of police officers, and the objective facts and
circumstances supply some evidence of what the police officer was actually
thinking. In effect, a finding that probable cause did not—objectively—exist
is tantamount to a finding that the police officer could not possibly have
believed that the search was justified. See footnote 22 of this dissent. In
the present appeal, we know from Marrero's own testimony that he did not
believe that the search was justified. See footnote 3 of this dissent.

The majority's interpretation of *Trine* cannot withstand scrutiny, for at least two reasons: (1) it contradicts unambiguous statements elsewhere in *Trine*; and (2) it contradicts both the United States Supreme Court's opinion in *Hicks* and our own opinions in *Onofrio* and *Reddick*. What the court meant in *Trine* is that an officer's good faith belief is necessary, but not sufficient. In order to pass constitutional muster, the court explained, an officer's good faith belief that he possesses probable cause must *also* be objectively reasonable. Although *Trine* does focus on what a reasonable person would have thought, it does so only as an additional procedural safeguard—to assure that the searching officer's good faith belief was "based on *more than a hunch or speculation.*"[19] (Emphasis added; internal quotation marks omitted.) *State* v. *Trine*, supra, 236 Conn. 224; accord *State* v. *Wilkins*, 240 Conn. 489, 496, 692 A.2d 1233 (1997); *State* v. *Gant*, 231 Conn. 43, 65, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995); *State* v. *Cofield*, 220 Conn. 38, 45, 595 A.2d 1349 (1991); *State* v. *Aversa*, 197 Conn. 685, 691, 501 A.2d 370 (1985). In other words, "[a]n objective test is employed to determine the reasonableness of a police officer's *belief*" that he possesses probable cause. (Emphasis added.) *State* v. *Blades*, 225 Conn. 609, 618, 626 A.2d 273 (1993).

On the facts of *Trine*, the court emphasized that the searching officer "did not act upon whim, speculation or pretext when he conducted the . . . search. [Instead, he] acted upon [the requisite level of] suspicion, sufficiently articulated in his testimony as credited

---

[19] It is for this reason that the court required that "the police officer must be able to point to *specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." (Emphasis added; internal quotation marks omitted.) *State* v. *Trine*, supra, 236 Conn. 224–25.

by the trial court,[20] _and_ _objectively supported_ by the circumstances surrounding his encounter with the defendant . . . ." (Emphasis added.) _State_ v. _Trine,_ supra, 236 Conn. 227. If the motives of the actual police officer who conducted the search had been irrelevant, it would have made no difference whether he based his actions upon "hunch" or "whim," upon probable cause, or even upon racial animus. Because the constitutionality of a search in fact depends, in part, upon the searching officer's motivation, we require _both_ that the officer "acted upon [the requisite level of] suspicion . . . _and_ [that this good faith belief was] objectively supported . . . ." (Emphasis added.) Id.

To be perfectly clear, an officer who seizes an item in plain view violates the constitution unless the seizure satisfies two independent criteria. First, the officer must subjectively believe that he has probable cause to seize the item.[21] Second, this good faith belief must be objectively reasonable: at the suppression hearing, the court must determine that—based upon what the officer actually knew—a reasonable officer would have subjectively believed that he had probable cause to seize the item.[22]

---

[20] More specifically, the officer in _Trine_ "immediately concluded that the object that he felt [in the defendant's pocket] was rock cocaine on the basis of his knowledge that rock cocaine was hard and often kept in small plastic bags, like the object that he felt . . . ." _State_ v. _Trine,_ supra, 236 Conn. 221.

[21] In _Horton_ v. _California,_ supra, 496 U.S. 142, the United States Supreme Court concluded that the officer subjectively believed that he had probable cause: "It was immediately apparent _to the officer_ that [the items in plain view] constituted incriminating evidence. He had probable cause . . . _to believe_ that the [items] had been used in the crime he was investigating." (Emphasis added.) The court neither stated nor implied that the seizure would have been constitutional in the absence of this crucial fact.

[22] This objective criterion serves two functional purposes. First, the fact that an officer subjectively believes that he has probable cause to seize an item does not make it so. We are unwilling to admit evidence against a defendant based upon nothing more than a rogue officer's mistaken impression that he was entitled to seize it. The objective standard thus interposes _a judicial determination that a particular seizure comports with the constitution._ Second, officers may sometimes prevaricate in order to create the

The wrong that inheres in authorizing an officer of the law to seize a personal possession from a citizen's home, even though the officer believes that he is violating the constitution, stems from our rich heritage of vigilantly protecting our citizens from arbitrary invasion of their homes by agents of the state. It must be remembered that the plain view doctrine is an *exception* to the presumption that warrantless searches of a citizen's home violate the constitution. The exception is narrowly circumscribed, and for good reason. Pursuant to the plain view doctrine, we do not ask an officer who is legitimately present in a citizen's home to avert his eyes when he realizes—based upon probable cause— that he is looking at evidence of criminality. If the person opening the door to greet an officer returning a lost dog were holding a smoking gun, we would not expect the officer to ignore what he should properly recognize as probable evidence of a crime. In the present appeal, however, the incriminating nature of the seized item was *not* immediately apparent to Marrero, the officer who saw it.[23] Accordingly, the facts of the present appeal do not justify an exception to the fundamental rule that an officer cannot seize personal property from a citizen's home unless he is authorized to do so by a warrant issued upon probable cause by a detached and neutral magistrate.

The majority opinion rips the heart out of the exclusionary rule, a doctrine that is founded upon the premise that suppression is necessary to deter police officers from breaking the law.[24] See, e.g., *Rakas v. Illinois*, 439

---

semblance of good faith, and an objective standard is necessary to expose such deception. In other words, we conclusively presume that an officer acted in bad faith unless his alleged "belief" that he had probable cause is objectively reasonable. See footnotes 18 and 19 of this dissent.

[23] See footnote 3 of this dissent.

[24] For a cogent argument that the jurisprudence of the exclusionary rule should focus upon the civil rights of citizens whose privacy has been violated by rogue police officers, see *United States v. Leon*, 468 U.S. 897, 943, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) (Brennan, J., dissenting) ("[r]ather than seeking to give effect to the liberties secured by the Fourth Amendment

U.S. 128, 169, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978) (White, J., dissenting) ("[T]he very purpose of the Bill of Rights was to answer the justified fear that governmental agents cannot be left totally to their own devices . . . . Some policemen simply do act in bad faith, even if for understandable ends, and some deterrent is needed."). The majority does not dispute that a warrantless seizure of an item from a citizen's home violates the constitution, unless the item is in plain view and its seizure is justified by probable cause. It is perfectly obvious to me that we cannot deter such lawless activity if we allow officers to seize items from the homes of citizens, even though the officers do not *believe* that probable cause exists.[25] In my view, this is so "no matter how pristine [the seizure] might otherwise objectively, fortuitously appear." J. Burkoff, "Bad Faith Searches," 57 N.Y.U. L. Rev. 70, 112 (1982);[26] see R. Eyer, "The Plain View Doctrine After *Horton* v. *California*: Fourth Amendment Concerns and the Problem of Pretext," 96 Dick. L. Rev. 467, 485 (1992) ("[t]he need to deter . . . subjectively unconstitutional police conduct is as great as the need to deter objectively unconstitutional police conduct").

In my view, we must accept the inevitable fact that a certain number of factually guilty defendants will

---

through guesswork about deterrence, the Court should restore to its proper place the principle framed 70 years ago in *Weeks* [v. *United States*, 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914)] that an individual whose privacy has been invaded in violation of the Fourth Amendment has a right grounded in that Amendment to prevent the government from subsequently making use of any evidence so obtained").

[25] At the risk of stating the obvious, the new rule that the majority has created will have no deterrent effect because it will not discourage officers from conducting searches that they believe violate the constitution. Many of these undeterred searches will also be objectively unconstitutional.

[26] In his article, Professor Burkoff discusses the unconstitutionality of police conduct in the context of a hypothetical search that is strikingly similar to the facts of the present case. See J. Burkoff, supra, 57 N.Y.U. L. Rev. 84–92.

elude punishment. As Justice Scalia—speaking for the majority of the United States Supreme Court in *Hicks*—eloquently put it, "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona* v. *Hicks*, supra, 480 U.S. 329.

A generation ago, Justice Thurgood Marshall wrote that "good police work is something far different from catching the criminal at any price. It is equally important that the police, as guardians of the law, fulfill their responsibility to obey its commands scrupulously." *Brewer* v. *Williams*, 430 U.S. 387, 407, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977) (Marshall, J., concurring). Because I agree with these words, I dissent.