THE STATE OF OHIO, APPELLEE, *v.* NEWCOME, APPELLANT.

(Nos. 3-86-8 and 3-86-9—Decided June 16, 1987.)

*Stanley Flegm,* prosecuting attorney, and *Russell B. Wiseman,* for appellee.

*Stephen E. Maher* and *Steven A. Larson,* for appellant.

COLE, P.J. These are appeals by the defendant, Rickey D. Newcome, from judgments of conviction and sentence by the Court of Common Pleas of Crawford County for several offenses involving drugs and weapons. In the trial court the two appeals now before us (Crawford County case Nos. 3-86-8 and 3-86-9) were essentially considered together and, although still separate appeals, involve the same issues, the same assignments of error and similar procedural histories. Both cases therefore are considered in this opinion, but separate journal entries of judgment are entered.

The single assignment of error in both cases reads as follows:

"The court erred in overruling appellant's motion to suppress evidence seized without a warrant in the aftermath of a residential fire where exigent circumstances had ceased."

Before we commence our analysis of this issue it is necessary to determine the specific procedural framework which must guide these considerations.

In each case a transcript dated June 9, 1986 was stricken from the files as being untimely filed. This, however, was not essential to the determination of the issue herein posed. The transcript dated June 3, 1985 was timely filed and constitutes the record of the evidentiary hearing on the motions to suppress made in each case. (We cannot locate the motion in case No. 3-86-9, but the trial court made the same judgment and en-

try as in the companion case.) The trial court entered an opinion containing specific findings of fact pursuant to Crim. R. 12(E).

Turning then to the factual basis for the question presented, we find that on December 15, 1984, a fire occurred at the residence of the defendant who was not at home at that time. The Galion Fire Department was called to the scene, fought the fire and during the course of their efforts discovered certain drugs and weapons. It was to suppress these items that the motion to suppress was directed. The motion was overruled and subsequently the defendant entered pleas of no contest to the charges of which he stands convicted.

The central issue therefore concerns the question of a violation of the rights of the defendant against unreasonable searches and seizures, it being contended that the fire department personnel, in the absence of a warrant, were not authorized to make a search of the premises.

The case of *Michigan* v. *Clifford* (1984), 464 U.S. 287, sets forth a thorough analysis of the situation created by a destructive and serious fire in a residence and the discovery therein of incriminating evidence by the members of the fire department engaged in fighting the fire.

Justice Powell in his opinion states at 293:

"A burning building of course creates an exigency that justifies a warrantless entry by fire officials to fight the blaze. Moreover, in [*Michigan*] v. *Tyler* [(1978), 436 U.S. 499] we held that once in the building, officials need no warrant to *remain* for 'a reasonable time to investigate the cause of a blaze after it has been extinguished.' 436 U.S., at 510. Where, however, reasonable expectations of privacy remain in the fire-damaged property, additional investigations begun after the fire has been ex- tinguished and fire and police officials have left the scene, generally must be made pursuant to a warrant or the identification of some new exigency." (Emphasis *sic*.)

In footnote six the court states at 295:

"The plain-view doctrine must be applied in light of the special circumstances that frequently accompany fire damage. In searching solely to ascertain the cause, firemen customarily must remove rubble or search other areas where the cause of fires is likely to be found. An object that comes into view during such a search may be preserved without a warrant."

In *Clifford* it was determined that the search commenced four or five hours after the fire had been extinguished; that the fire investigators returned to the scene; and that the state claimed no exigent circumstances justified the search.

In the case before us, however, the various items sought to be excluded as evidence were discovered while the firemen were searching for the cause of the fire and for lingering areas of heat which might have rekindled the fire anew. These areas were referred to as "hot spots." The major area concerned was a downstairs bedroom which, among other items, contained a water bed. A false ceiling had fallen over the water bed. The fire chief stated:

"Q. Did you, as part of your putting out the fire, we will call it, continue in that bedroom then?

"A. Right. There were other places in the bedroom where there was smoke coming from down near the floor in the rear of the bed. We found some ammunition, live ammunition and this caused us to further look to make sure there wasn't any other ammunition in the room or guns that might be loaded that would go off and injure one of our own.

"Q. This ammunition and money

and the sack of pills that you described that were found, how near were they to places of the fire, and possible hot spots and so forth?

"A. The whole bedroom itself was a possible hot spot. Like I said, the ceiling had come down and was scattered around the whole room. It had fallen on everything. And, there could have been hot spots any place in the whole room.

"* * *

"Q. In the bedroom area, was it necessary as part of your investigation, to lift this mattress up and move articles of furniture around in the room?

"A. Yes, well we still had to lift the mattress to see where the wires went. We found they went to a heater. About that time we discovered this was a water bed, and having a water bed myself, I knew there was a middle part underneath that is closed off that you couldn't get to. And the only way you can get to it is to take the body up off the bed. We had to take the mattress up and go under the boards to see if there was any fire down underneath it.

"Q. As you were checking, do you recall, would you testify to the different things that were found? First of all, who did the actual searching with you?

"A. Me and the firemen. I told them if they run across any money or any other pills we had seen like the first ones, to turn them over to the police department.

"Q. The principle [sic] reason for your search was still —

"MR. REDMOND: Objection, Your Honor that is a leading question.

"THE COURT: That's correct.

"Q. What was the reason you continued to search that bedroom area?

"A. We were searching for hot spots because there was still smoke in the house, and we have to — especially after we found something that is dangerous to the house such as ammunition — we make a thorough search to make sure that any hot spots won't rekindle and cause a lot more damage. * * *"

In short, there was substantial testimony that the exigency or emergency required immediate action to discover remaining areas where the fire might rekindle and this was the basic object of the search, that the search was not stopped and begun at a later time but continued during the entire fire-fighting process and was essential to that process even though the major area of the fire was under control.

The trial court found in ruling upon the motion:

"Clearly, this Court feels that this is more than a case of the police barging into a home and conducting a search without a warrant. Here the firefighters found the items when they were looking for hotspots in their course of fighting this fire and saving as much of the contents of the house as they could. It seems ridiculous to indicate that when the officers did stumble across these pills, weapons, and ammunition that they would have to stop what they were doing and attempt to get a search warrant and then stand around and watch the hotspots ignite into a blaze while waiting to have that search warrant executed. The evidence which the firefighters retrieved were [sic] not items they were specifically looking for. The testimony clearly indicated that they were solely looking for hotspots which they felt could ignite or re-ignite, causing further damage. Clearly a warrant should not be necessary in situations such as this."

There was some conflict in the testimony but the trial court was the trier of fact and there was testimony before it fully supporting a finding that the firemen were determining the

cause of the fire and were seeking to assure that the fire would not smolder in hidden areas and reoccur. This was a part of the circumstance of peril that was the basic reason for the activity of the firefighters and was not an effort by them to search the premises for evidence of a crime. In the course of this wholly necessary activity the articles sought to be suppressed were brought into plain view.

While there were policemen brought in by the firemen after this discovery their functions again were not to search for evidence but essentially to inventory the partially burned money which had been discovered.

In *United States* v. *Metzger* (C.A. 6, 1985), 778 F. 2d 1195, certiorari denied (1986), 477 U.S. 906, a situation was presented involving the explosion of an automobile which constituted the core of the exigency involved. The court stated at 1199-1200:

"The explosion of a vehicle clearly creates an exigency justifying a warrantless entry by police, fire, and rescue workers. It is equally clear that once on the scene of an explosion 'officials need no warrant to *remain* for "a reasonable time to investigate the cause of the [explosion]." ' *Michigan* v. *Clifford,* 464 U.S. 287, 104 S. Ct. 641, 646-47, 78 L. Ed. 2d 477 (1984) (emphasis in original) (footnote omitted) [quoting *Michigan* v. *Tyler,* 436 U.S. 499, 510, 98 S. Ct. 1942, 1950, 56 L. Ed. 2d 486 (1978)].

"The fact that the investigators did not remain with the vehicle while it was being removed from the scene, but instead made what is the equivalent of a 're-entry,' does not change the result. Rather, '[t]he critical inquiry is whether reasonable expectations of privacy exist in the . . . damaged premises at a particular time . . . .' *Clifford,* 104 S. Ct. at 646 n. 3. A determination of whether defendant had a reasonable expectation of privacy is, of course, made by looking at the totality of the circumstances."

In the case *sub judice,* the reasonable expectation of privacy of the appellant would not extend, considering all the circumstances as found by the trial court, to forestall the search for hotspots capable of rekindling the initial fire. The testimony would indicate such a search was not unusual or unique to appellant's situation, but constituted a normal safety practice and was the objective of the search made in this instance. Fireman Volk testified that "when he arrived the fire was pretty much out." However, "[t]here were some hotspots" located in the bedroom. When the guns were found, "[i]t was smoldering and steaming. It was still pretty hot."

We find that there was ample testimony to support the facts and conclusions of the trial court. Moreover, based on the testimony, there was sufficient congruence with the rationale of *Clifford* to fully warrant the action of the trial court in overruling the motion to suppress.

The assignment of error is not well-taken.

*Judgment affirmed.*

MILLER and EVANS, JJ., concur.