[Cite as *State v. Hommes*, 2021-Ohio-4568.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

| | |
|---|---|
| STATE OF OHIO | **CASE NO. 2020-A-0001** |
| Plaintiff-Appellant, | |
| - v - | Criminal Appeal from the Court of Common Pleas |
| NICOLE L. HOMMES, | |
| Defendant-Appellee. | Trial Court No. 2019 CR 00371 |

# O P I N I O N

Decided:  December 27, 2021
Judgment:  Reversed; remanded

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Shelly M. Pratt*, Assistant Prosecutor, Ashtabula County Prosecutor's Office, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellant).

*Casey P. O'Brien*, Ibold & O'Brien, 401 South Street, Chardon, OH 44024 (For Defendant-Appellee).

THOMAS R. WRIGHT, J.

{¶1}    The state of Ohio appeals the trial court's judgment granting Nicole L. Hommes' motion to suppress evidence seized from her residence without a warrant.  The judgment is reversed.

{¶2}    In February 2019, the Ashtabula Fire Department responded to a fire at Hommes' residence.  Multiple children safely exited the home.  Captain Stephen Chase, a certified fire investigator, searched the house to determine the origin and cause of the

fire. Hommes was not present when the fire ignited and did not return until after the fire had been suppressed and the captain was conducting his investigation.

{¶3} Based on items discovered in and seized from the home, Hommes was indicted on charges of aggravated trafficking in drugs, aggravated possession of drugs, possessing criminal tools, illegal use or possession of drug paraphernalia, and endangering children. She filed a motion to suppress all evidence seized from her residence by the fire and police departments, alleging they had violated her constitutional rights. The following testimony was elicited at the hearing.

{¶4} Captain Chase testified that he was called to the fire around 6:30 a.m. He arrived within "twenty minutes, maybe," but could not enter the residence for another 30 to 45 minutes due to active suppression of the fire. When asked whether suppression efforts were still ongoing when he finally did enter, Captain Chase testified as follows:

> Yes. Normally when we, when the fire crews put out a fire, as long as the investigator's available, they will extinguish the fire the majority of the way. And then they want to accomplish what's called overhaul, where they rip things apart and they make sure the fire's out. Make sure there's nothing smoldering that's gonna reignite. Typically, and in this case, they hold off on that process until I've had a chance to investigate, because that process involves throwing a bunch of stuff out the window, moving a bunch of stuff. It disturbs evidence and makes my job more difficult. So typically they wait. In this case they did wait.

Captain Chase further explained that "overhaul" is a "subset of suppression":

> So when we have a fire, we go there, we extinguish the fire by whatever means necessary. We put out the main body of the fire. That typically requires large volumes of water. * * * We try to put that fire out as fast as possible to save lives, protect property, so on and so forth. * * * There's still void spaces in houses, there's still debris there that could have embers underneath that are still burning, that are still capable of reigniting as they sit there and smolder. Putting that out, and

2

the disassembly of whatever we have to to complete that extinguishment is what we call overhaul. It is the responsibility of the suppression crew.

{¶5} When extinguishing the fire, the suppression crew had breached a locked interior door to a room described as an office. In that room, Captain Chase observed two computers connected to webcams pointed at the back door of the home, ammunition, airsoft pistols, and an open safe on the floor that appeared to contain illegal drugs and paraphernalia. It was reported that a handgun had also been seized from that room by the fire suppression crew and turned over to a police officer. Captain Chase seized the two computers, which were then locked in evidence at the fire department. Captain Chase testified that he has "had a number of trainings dealing with evidence collection," but that it is "outside the scope of my training as a fire investigator to collect [drugs] as evidence"; "nor am I trained to collect weapons." He contacted the Ashtabula Police Department and requested an officer to respond. At this time, the captain testified, he had not yet searched the entire house nor determined the cause and origin of the fire. Captain Chase testified that Officer Thomas Perry, a patrolman at the time, "was there quickly," within "five minutes, ten minutes."

{¶6} Patrolman Perry testified that he arrived around 9:25 a.m. in response to the call from Captain Chase and that he did not know why he was called to the scene until he arrived. When asked if there were any fire trucks on scene when he arrived, Patrolmen Perry testified, "I don't recall if there were or not." Captain Chase showed him the ammunition and the safe; advised that he did not know, but it was his suspicion, that the safe contained illegal drugs; and indicated he did not know at that point in time

3

Case No. 2020-A-0001

whether it was pertinent to his investigation as to the cause of the fire. Neither Captain Chase nor Patrolman Perry took pictures of the safe or its contents.

{¶7} Patrolman Perry secured the items and placed them in evidence. He suspected the substance was methamphetamine, which was later confirmed by a presumptive test at the police station. The officer also collected two boxes of 9mm ammunition from the office. A warrant was not obtained for the seizure of evidence. Patrolman Perry testified, as pertains to the items he collected, as follows:

> Q. And what did you do then, as it pertained to these items [Captain Chase] found?
>
> A. *I went into the area that he was checking and securing*, and in plain view in the safe sitting in the safe – the door of the safe was open – I located the items he was speaking of. [Emphasis added.]
>
> Q. And what were those items?
>
> A. Three bags of crystalline substance that I suspected to be methamphetamine, and two digital scales.
>
> Q. And what did you do with those items?
>
> A. I secured those items and placed them in evidence.
>
> * * *
>
> Q. Okay. Was anything else taken from this room and logged into evidence with APD in this case?
>
> A. I logged in two boxes of 9mm ammunition, and another scale. * * *
>
> Q. The ammo, is that something you collected at the same time that you had collected the drugs?
>
> A. Yes.
>
> Q. And where did you collect those from?

Case No. 2020-A-0001

A. Same room, in plain site [sic], sitting on like a desk or shelf.

* * *

Q. Okay. Did you go into any other rooms in that house?

A. I did not.

Q. Did you rifle through that office space after Capt. Chase showed you the drugs and the ammo?

A. I did not.

A. You just collected it and left?

Q. Right. * * * The house wasn't safe.

{¶8} After clearing the office, Captain Chase continued his investigation in the living room and, finally, in the bedroom, which he determined was the origin of the fire.

{¶9} The fire department's report was presented by defense counsel during cross-examination. It indicates that Captain Chase arrived on scene around 7:12 a.m., the fire chief was already on scene, and they both cleared the scene around 9:30 a.m. The fire suppression units were released from the scene one at a time between approximately 8:45 a.m. and 9:07 a.m. Although the fire suppression was complete, Captain Chase was still conducting his investigation:

> [Defense Counsel]: And L1, Ladder One, it was the first one that was cleared, was it not?
>
> Capt. Chase: If that's what the report says. To be honest, when the crews were getting released I was inside investigating the fire. The fire chief was releasing crews. * * *
>
> * * *
>
> [Defense Counsel]: And at 9:07 I think there's a note that indicates all units were cleared except for FI-1 [previously identified as Captain Chase] who's on scene conducting investigation.

5

Case No. 2020-A-0001

Capt. Chase: Yes. * * * That is in the narrative.

[Defense Counsel]: And that 9:07 timeline, that kind of lines up with your recollection of your investigation?

Capt. Chase: Yeah, as best I can remember. * * *

{¶10} The trial court granted Hommes' motion to suppress the evidence that was seized by the police department. The court found that Captain Chase was authorized to enter the residence without a warrant to conduct an immediate investigation into the origin and cause of the fire; he was lawfully present, and the suspected illegal drugs and paraphernalia were in plain view; and, recognizing it was not his job to collect evidence of that nature, it was appropriate to report his observations to the police department. The court concluded, however, that "[t]he facts in this case do not present exigent circumstances or any other basis that would trigger an exception to the Fourth Amendment requirement for a search warrant," and therefore the police department was required to "take the information received from the firefighters to an impartial Magistrate for a determination of whether there is probable cause to issue a warrant for a search of the residence."

{¶11} The state of Ohio noticed this appeal, advancing one assignment of error:

{¶12} "The Trial Court erred in granting Appellee's Motion to Suppress."

{¶13} Appellate courts review rulings on a motion to suppress under a mixed standard of review. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "[T]he trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.* We must accept the trial court's findings of fact if they are supported by competent, credible

6

evidence, and then independently decide whether those facts satisfy the applicable legal standards without deference to the trial court's decision. *Id.*

{¶14} In reaching its decision, the trial court relied solely on this court's opinion in *State v. Sutcliffe*, 11th Dist. Portage No. 2008-P-0047, 2008-Ohio-6782. The state's sole argument on appeal is that the facts and circumstances before the trial court are distinguishable from those that were before this court in *Sutcliffe* and, applying the applicable Fourth Amendment standards, it was error to grant Hommes' motion.

{¶15} The Fourth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

{¶16} The basic purpose of the Fourth Amendment "'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter v. United States*, 585 U.S. ____, 138 S.Ct. 2206, 2213, 201 L.Ed.2d 507 (2018), quoting *Camara v. Municipal Court of City & Cty. of San Francisco,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The suppression of evidence obtained as a result of a Fourth Amendment violation is essential to its protections. *Weeks v. United States,* 232 U.S. 383, 394, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Mapp v. Ohio,* 367 U.S. 643, 649, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Article I, Section 14 of the Ohio Constitution likewise protects against arbitrary government invasions, affording the same protection in felony cases as the Fourth Amendment. *State v. Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, 37 N.E.3d 123, ¶ 12, citing *State v. Smith*, 124 Ohio St.3d 163, 2009-

7

Ohio-6426, 920 N.E.2d 949, ¶ 10, fn. 1, citing *State v. Robinette*, 80 Ohio St.3d 234, 238-239, 685 N.E.2d 762 (1997). The touchstone of both is reasonableness. *Pennsylvania v. Mimms*, 434 U.S. 106, 108-109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *State v. Lozada*, 92 Ohio St.3d 74, 78, 748 N.E.2d 520 (2001).

{¶17} "'[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, 96 N.E.3d 262, ¶ 17, quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted). "When a defendant moves to suppress evidence recovered during a warrantless search, the state has the burden of showing that the search fits within one of the defined exceptions to the Fourth Amendment's warrant requirement." *Banks-Harvey* at ¶ 18, citing *Athens v. Wolf*, 38 Ohio St.2d 237, 241, 313 N.E.2d 405 (1974).

{¶18} The doctrine of exigent circumstances is one such exception. "'Exigency' denotes the existence of 'real immediate and serious consequences' that would certainly occur were a police officer to postpone action to get a warrant.'" *State v. Stanberry*, 11th Dist. Lake No. 2002-L-028, 2003-Ohio-5700, ¶ 14, quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). "A warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *State v. Applegate*, 68 Ohio St.3d 348, 350, 626 N.E.2d 942 (1994), quoting *Terry v. Ohio*, 392 U.S. 1, 26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A fire is one of only a few exigencies recognized under this doctrine by the United States Supreme Court. *See Welsh* at 750.

8

{¶19} Additionally, the plain view doctrine permits the warrantless seizure of evidence if (1) the officer did not violate the Fourth Amendment in arriving at the place from which the object could be plainly viewed; (2) the object's incriminating character is "immediately apparent"; and (3) the officer has a lawful right of access to the object itself. *State v. Zerucha*, 11th Dist. Ashtabula No. 2015-A-0031, 2016-Ohio-1300, ¶ 17, citing *Horton v. California*, 496 U.S. 128, 136-137, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

{¶20} The plain view doctrine serves as an extension of the original justification for the officer's presence, whether it be a warrant to search for another object, exigent circumstances, or some other lawful reason. *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

> The principle is grounded on the recognition that when a police officer has observed an object in 'plain view,' the owner's remaining interests in the object are merely those of possession and ownership. Likewise, it reflects the fact that requiring police to obtain a warrant once they have obtained a first-hand perception of contraband, stolen property or incriminating evidence generally would be a 'needless inconvenience,' that might involve danger to the police and public.

(Internal citation omitted.) *Texas v. Brown*, 460 U.S. 730, 739, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), quoting *Coolidge* at 468.

{¶21} "The limits on the doctrine are implicit in the statement of its rationale. The first of these is that plain view *alone* is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'" (Emphasis added.) *Coolidge* at 468. "Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may

9

establish the fullest possible measure of probable cause.  But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure."  (Citations omitted.)  *Id.*

{¶22}  Fourth Amendment protections and the exceptions thereto extend to fire officials responding to an ongoing fire.  *Michigan v. Tyler*, 436 U.S. 499, 506, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) ("there is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman").  Applying the doctrines of exigent circumstances and plain view, the United States Supreme Court held that "[a] burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable[,]' * * * [a]nd once in a building for this purpose, firefighters may seize evidence of arson that is in plain view."  *Id.* at 509, citing *Coolidge* at 465-466.  Further, "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished."  *Tyler* at 510.

{¶23}  Also in *Tyler*, the United States Supreme Court explained that "*the exigency justifying a warrantless entry to fight a fire*" does *not* end—and "the need to get a warrant" does *not* begin—"with the dousing of the last flame": "this view of the firefighting function is unrealistically narrow."  (Emphasis added.)  *Id.* at 509-510.

> Prompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wiring or a defective furnace. Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction. And, of course, the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and the recovery efforts of the victims.

10

*Id.* at 510. And, finally, "if the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional." *Id.*

{¶24} Subsequently, the United States Supreme Court again held that "*[t]he aftermath of a fire often presents exigencies* that will not tolerate the delay necessary to obtain a warrant or to secure the owner's consent to inspect fire-damaged premises. Because determining the cause and origin of a fire serves a compelling public interest, the warrant requirement does not apply in such cases." (Emphasis added.) *Michigan v. Clifford*, 464 U.S. 287, 294, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). "Where, however, reasonable expectations of privacy remain in the fire-damaged property, *additional investigations* begun after the fire has been extinguished and fire and police officials have left the scene, generally *must be made pursuant to a warrant or the identification of some new exigency.*" (Emphasis added.) *Id.* at 293.

{¶25} Additionally, "[t]he object of the search is important even if exigent circumstances exist. Circumstances that justify a warrantless search for the cause of a fire may not justify a search to gather evidence of criminal activity once that cause has been determined." *Id.* at 294. "If, for example, the administrative search is justified by the immediate need to ensure against rekindling, the scope of the search may be no broader than reasonably necessary to achieve its end." *Id.* at 294-295. In that scenario, evidence of criminal activity discovered in plain view may be seized and may be used to establish probable cause to obtain a criminal search warrant. *Id.* "Fire officials may not, however, rely on this evidence to expand the scope of their administrative search without first making a successful showing of probable cause to an independent judicial officer."

11

*Id.* at 294. "A search to gather evidence of criminal activity not in plain view must be made pursuant to a criminal warrant upon a traditional showing of probable cause." *Id.* at 295.

{¶26} "'Reading *Tyler* and *Clifford* together, certain principles regarding the Fourth Amendment and investigations of the causes and origins of the fire are clear[:]

> Firemen have the right to enter a private residence without a warrant without violating the Fourth and Fourteenth Amendments [to] the United States Constitution, if done so for the purpose of extinguishing a fire.
>
> While performing the task, firemen may seize any evidence, which is in plain view, of the cause and origin of the fire.
>
> In fighting the fire, fire officials are also immediately charged with determining the cause and origin of the fire. The purposes of the investigation into the cause and origin of the fire may properly include prevention of the rekindling of the fire, *and* prevention of the destruction of evidence, either accidentally or intentionally.
>
> *When the search is conducted for one of these purposes, no search warrant is necessary, even if consent has not been granted, but only if the search is a continuation of an initial entry.* If the nonconsenting, warrantless entry is begun, but must be terminated due to the condition of the building, then that search may be continued at the first instance reentry is possible.
>
> Finally, if it is clearly shown that the search is not for the purpose of determining the cause and origin of the fire, but rather to obtain evidence of criminal activity, then such search must either be with consent or with a valid search warrant.'

(Emphasis added.) *State v. Grant*, 7th Dist. Mahoning No. 83 C.A. 144, 1990 WL 176825, *11-12 (Nov. 9, 1990), quoting *Commonwealth v. Smith*, 511 Pa. 36, 45-46, 511 A.2d 796 (1986).

12

{¶27} *Tyler* and *Clifford* both involved the seizure of evidence related to arson. Numerous state and federal courts, including Ohio, have concluded that evidence of other crimes may also be seized without a warrant when observed in plain view while extinguishing a fire and during the initial investigation into the cause and origin of a fire. *See, e.g., State v. Newcome,* 41 Ohio App.3d 51, 534 N.E.2d 370 (3d Dist.1987) (drugs and weapons) and *State v. Behrens*, 8th Dist. Cuyahoga No. 63837, 1993 WL 483799, *4 (Nov. 18, 1993) (stolen vehicle); *see also* Annotation, *Admissibility, in Criminal Case, of Evidence Discovered by Warrantless Search in Connection with Fire Investigation— Post-*Tyler *Cases*, 31 A.L.R.4th 194 (1984) (collecting cases).

{¶28} Additionally, multiple courts have held that where a fire official lawfully observes evidence of a crime in plain view, a police officer may be called upon to seize that evidence without a warrant. *E.g., Grant* at *5, citing *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir.1974), *cert. denied* 419 U.S. 1002 (1974); *United States v. Green*, 474 F.2d 1385, 1390 (5th Cir.1973), *cert. denied* 414 U.S. 829 (1973); and *Commonwealth v. Person*, 560 A.2d 761, 768-769 (Pa.Super.1989). Importantly, however, the police officer must not exceed the boundaries of the fire official's valid investigation or undertake a general search of the premises. In other words, without a warrant the police officer is merely permitted to "step into the shoes" of the fire official. *E.g., Martin v. State*, 576 S.W.3d 818, 826 (Tex.App.2019), citing *Mazen v. State*, 189 Ariz. 195, 940 P.2d 923, 929 (1997); *State v. Eady*, 249 Conn. 431, 733 A.2d 112, 120 (1999); *State v. Bower*, 21 P.3d 491, 497 (Idaho App.2001); *Jones v. Commonwealth*, 29 Va.App. 363, 512 S.E.2d 165, 169 (1999); *State v. Bell*, 108 Wash.2d 193, 737 P.2d 254, 259 (1987). "They cannot enter any area that the fire fighters were not justified in entering, nor seize any evidence

13

that the fire fighters were not justified in seizing." *Bell* at 259. "The officers arriving to seize the evidence would be entitled to expand the scope of the earlier intrusion only if they obtain a warrant or if 'one of the exceptions to the warrant requirement justifies a more thorough or wide ranging search.'" *Id.* at fn. 6, quoting *United States v. Brand,* 556 F.2d 1312, 1317, fn. 9 (5th Cir.1977).

> In such a circumstance, the defendant's privacy interest has already been compromised to the extent of the emergency personnel's intrusion. So long as the emergency personnel are still lawfully on the premises at the time of the police officer's arrival, and the officer's intrusion does not exceed that of the emergency personnel, either temporally or spatially, the defendant suffers no additional injury to his privacy interest by the officer's entry for purposes of seizing the already-discovered contraband.

*Bower* at 497.

{¶29} Here, applying these Fourth Amendment standards and exceptions, we conclude that Captain Chase was permitted to enter the residence without a warrant under the doctrine of exigent circumstances. During the initial entry, while investigating and before he had determined the cause and origin of the fire, Captain Chase discovered contraband in plain view. Due to limitations on his training with evidence collection, he acted appropriately in requesting assistance from the police department. Patrolman Perry was permitted to enter the residence and seize the contraband without a warrant *only* because he "stepped into the shoes" of Captain Chase, who was still on the scene conducting his initial investigation. Patrolman Perry entered solely for the purpose of assisting Captain Chase; he collected only the items to which he was directed by Captain Chase; he did not search any other area of the residence; and he did not further intrude

14

on Hommes' privacy interests. Accordingly, the warrantless seizure did not violate Hommes' Fourth Amendment rights.

{¶30} In *Sutcliffe*, on the other hand, we ultimately determined the defendant's Fourth Amendment rights had been violated.

{¶31} The facts of *Sutcliffe* are as follows: a volunteer firefighter responded to a house fire; the homeowner was not present; the firefighter breached a securely locked room due to its proximity to the flames outside the house; in the room, he observed thick smoke and "growing supplies." The firefighter reported his observation of "growing supplies" to the assistant fire chief, who contacted the sheriff's office; the fire was completely extinguished, and the house was vented by the time members of the sheriff's office arrived. A search warrant was not obtained prior to any law enforcement officials entering the residence. Sergeant Carrozzi, supervisor of the county's drug task force, "responded to the residence to investigate the purported illegal grow of marijuana." Sergeant Carrozzi identified plants in the room as marijuana plants, and he took photographs of the items in the room (marijuana plants, grow lights, and watering lines). The sergeant and other members of the drug task force seized the items and transported them to the drug task force headquarters. *Sutcliffe,* 2008-Ohio-6782, at ¶ 2-8.

{¶32} The defendant was indicted on drug charges, and the trial court granted the defendant's motion to suppress the evidence. *Id.* at ¶ 9-10. We affirmed the trial court's decision "[b]ecause exigent circumstances did not exist at the time the investigating officer searched [the] residence." *Id.* at ¶ 1. Just as here, we held that the firefighter was permissibly in the residence due to the exigency of the ongoing fire, and "his discovery of the grow items was permissible under the plain-view doctrine." *Id.* at ¶ 36. The fire

15

department also acted appropriately in reporting the suspected contraband to law enforcement personnel. *Id.* at ¶ 43. And, when the drug task force arrived, the fire had been suppressed.

{¶33} Not at issue in *Sutcliffe*, however, was whether the fire officials had concluded their immediate investigation into the fire's cause and origin by the time law enforcement entered the residence. The evidence was properly suppressed in *Sutcliffe* because no warrant had been obtained and there was no discussion as to an ongoing investigation; i.e., there was no demonstration of an exigency. Here, on the other hand, a warrant was not required because it was demonstrated that Captain Chase had not yet concluded his immediate investigation into the cause and origin of the fire; i.e., there was an ongoing exigency. *See Tyler*, 436 U.S. at 510 (the exigency justifying a warrantless entry to fight a fire does not end with the dousing of the last flame) and *Clifford*, 464 U.S. at 293 (the aftermath of a fire often presents exigencies). We therefore conclude that the facts and issues at hand are sufficiently distinguishable from those in *Sutcliffe*, such that the trial court misapplied *Sutcliffe*'s holding in granting Hommes' motion to suppress.

{¶34} The trial court erred in granting Hommes' motion to suppress, and the state's sole assignment of error has merit.

{¶35} The judgment of the Ashtabula County Court of Common Pleas is reversed, and this matter is remanded for further proceedings consistent with this opinion.


MARY JANE TRAPP, P.J., concurs,

MATT LYNCH, J., concurs in judgment only.

Case No. 2020-A-0001